**Ralph ARGENT, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 20350.

United States Court of Appeals
Fifth Circuit.

Dec. 12, 1963.

Carl A. Durkee, Pikesville, Md., for appellant.

Clinton Ashmore, U. S. Atty., Stewart J. Carrouth, Asst. U. S. Atty., Tallahassee, Fla., C. W. Eggart, Jr., Asst. U. S. Atty., Pensacola, Fla., for appellee.

Before RIVES and JONES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

The indictment charged that the defendant "did, with unlawful and fraudulent intent, cause to be transported in interstate commerce from Pensacola, Florida, to Montgomery, Alabama, a falsely made and forged * * * check * * * in the amount of $20.00, knowing the same to have been falsely made and forged. (18 U.S.C. 2314) " [1]

The defendant never, at any time, denied that he caused the forged check to be transported in interstate commerce. Nor has he denied that he knew the difference between right and wrong. His sole contention has been and remains that as the result of some mental defect or disease he was unable to refrain from doing wrong in the commission of the act charged.

He first attempted to enter a plea of nolo contendere, but, after a hearing, the district court declined to accept that plea, and directed the entry of a plea of not guilty. The defendant then waived a jury trial in writing with the approval of the court and the consent of the government as permitted by Rule 23(a), Fed.R. Crim.P.

The evidence was without conflict as to the commission of the act charged, except for the issue as to whether by reason of some mental defect or disease the defendant was unable to refrain from committing the act. We briefly summarize the evidence on that question in the order of its introduction.

William E. Hosler, Vice President of the Florida National Bank of Pensacola, Florida, after having a conversation with the defendant, had authorized the teller to cash the check. Mr. Hosler testified:

"Q. Now, Mr. Hosler, I want to ask you this question, did you see anything abnormal about this person at that particular time?

"A. No sir. He was very agreeable to talk with and I enjoyed our conversation. He was very affable.

"Q. And he appeared to you to be a normal everyday person that you deal with in your business?

"A. He did to me. If he hadn't I couldn't have taken a chance with a check.

"Q. From his facial expression did he show any strained look, or sadness look?

"A. No sir."

Tullis D. Easterling, Special Agent for the Federal Bureau of Investigation, had

---

1. The paragraphs of that section relating to the fraudulent transportation of goods or money require that they have a "value of $5,000.00 or more," but there is no minimum requirement in the paragraph relating to the fraudulent transportation of securities, including checks. In United States v. Sheridan, 1946, 329 U.S. 379, 390, 67 S.Ct. 332, 338, 91 L.Ed. 359, the Supreme Court said:

"Nor can we treat forged checks differently from other securities, either because they are forged or because the forgery is done by 'little fellows' who perhaps were not the primary aim of the congressional fire. The statute expressly includes checks. It makes no distinction between large and small operators. There is no room for implying such a distinction in view of the absence of the $5,000 limitation with respect to the transportation of forged checks. Whether or not Congress had in mind primarily such small scale transactions as Sheridan's, his operation was covered literally and we think purposively."

It is now settled that a check in an amount as small as $20.00 may form the basis for a charge under 18 U.S.C.A. § 2314. Caldwell v. United States, 8 Cir. 1947, 160 F.2d 371, 372; Olson v. United States, 4 Cir. 1956, 234 F.2d 956, 957; Carlson v. United States, 8 Cir. 1960, 274 F.2d 694, 696.

interviewed the defendant when he readily and voluntarily confessed to the acts charged. Mr. Easterling testified:

"Q. Mr. Easterling, how long were you around Mr. Argent at the time you were making the investigation?

"A. I suppose, probably an hour and a half, or two hours.

"Q. Will you describe his appearance, his conduct and behavior around you at the time you were associating with him?

"A. Well, I would say that he was perfectly normal, just as he is now. I saw nothing wrong. If I had I wouldn't have taken the statement because it wouldn't be of any value. He was perfectly rational. He explained everything. I knew nothing about the facts of this statement as far as what transactions, his activities, he furnished all of that voluntarily. I saw nothing whatsoever. His memory was excellent I thought."

Tully L. Patterson, Jr., Assistant Security Officer of the United States Navy Mine Defense Laboratory at Panama City, Florida, had been acquainted with the defendant in the service, for "off and on approximately three and a half to four years * * * through normal routine duties as being an investigator for the Navy, through association having a cup of coffee in the ward room or in the Chief's quarters, and aboard ship." Mr. Patterson testified:

"A. I saw Mr. Argent on the 15th of March, 1962, aboard the USS Skill.

"Q. Mr. Patterson, from your acquaintance with Mr. Argent over these period of years, can you say whether or not you noticed any change in his physical condition from the time you you first knew him until the time you last saw him in February or March?

"A. Not that I could observe.

"Q. Describe the general conversation that you had with him from time to time?

"A. Well, I would say that it was as normal as I would have with you as an acquaintance or someone I was conducting business with.

"Q. Did you ever have occasion to notice that he may have been cracking-up so-to-speak, a nervous breakdown?

"A. No sir."

Miss Betty Smith, an employee of a lounge and motel known as the Plaza at West Panama City Beach, testified that Ralph Argent registered at the motel, stayed there for three or four weeks, and was in to see her almost every day. Miss Smith further testified:

"Q. Now, did you have any dates with him?

"A. No sir, at no time.

"Q. You just got acquainted with him there at your business?

"A. That's right.

"Q. Did he ever appear to you to be abnormal, his behavior uncommon, or anything like that?

"A. No sir, not really.

*     *     *     *     *     *

"Q. Did he ever appear to you to be sick?

"A. No sir."

Douglas R. Meadows, President of the corporation which operated the motel at which Miss Smith worked, first met Ralph Argent in 1956, and saw him when he stayed at the motel in the winter of 1962. Mr. Meadows testified:

"Q. I will ask you, from your observation of him and knowing Mr. Argent, the time you saw him last when he was staying at your motel, what was his appearance to you, physically?

"A. He was in fine shape so far as I could tell. He looked just like he always did to me.

"Q. He looked about the same that he did when you knew him in 1956?

"A. It was 1956. Yes sir, he appeared to be the same.

"Q. Did he ever complain about being sick?

"A. No sir, he seemed to be in very good spirits."

Paul Frumpkin, a Lieutenant Junior Grade in the Navy, practiced clinical psychology and was assigned to the Neuropsychiatry Department of the School of Aviation and Medicine under Captain Philip B. Phillips, the head of that department. He estimated that at the time he examined the defendant he had made a study of approximately three hundred persons in the Navy "to determine their mental condition." His qualifications as a psychologist were admitted. He examined Ralph Argent on April 3, 1962. Lieutenant Frumpkin testified:

"A. So far as I could see there were some minor signs of depression and some signs of his having some sexual problems but nothing that I would think would be severely disabling and nothing that would interfere with his ability to reason.

\*　\*　\*　\*　\*　\*

"Q. Now, your interview coupled with your tests, what were your impressions?

"A. My final impression was, psychological tests and clinical co-interview tests suggest no disabling psychological pathology which would render Chief Argent unable to perceive the difference between right and wrong. Currently there is no evidence to suggest that he is incompetent to stand trial."

This last answer was a literal reading of the concluding paragraph of Lieutenant Frumpkin's written report to Captain Phillips on his examination of the defendant.

Captain Philip B. Phillips, a psychiatrist, and head of the Neuropsychiatry Department to which Lieutenant Frumpkin was assigned, did not himself examine Ralph Argent. He testified:

"Q. Now, from the report submitted to you by Mr. Frumpkin, do you have an opinion as to Mr. Argent from the written report?

\*　\*　\*　\*　\*　\*

"A. Well, based on the questionnaire which I read and after a number of years of giving an opinion about what sort of person I am dealing with, then the report of the technical examination done by Mr. Frumpkin and his conclusions, it was my impression that his conclusions were right, the man was able to perceive and distinguish between right and wrong and there was no evidence of disability or that he was incompetent, otherwise I would not have approved it.

\*　\*　\*　\*　\*　\*

"Q. Captain Phillips, did you at any time examine Mr. Argent?

"A. No sir, I did not examine Mr. Argent.

\*　\*　\*　\*　\*　\*

"Q. Captain Phillips, does it indicate there that he was referred to the Department, administrative referral, because he was in trouble?

"A. I have a letter here, Mr. Attorney, from the Commanding Officer of the Air Station to the Commanding Officer of the School, requesting that Argent be afforded a neuropsychiatric examination to demine the following data:

"A. Ability to distinguish between right and wrong.

"B. Ability to advise with counsel in his own behalf.

"Paragraph 2 says Argent has made a statement to the Federal Bureau of Investigation and has

requested this examination, indicating that he asked for it.

\* \* \* \* \* \*

"Q. Captain Phillips,—and, if Your Honor please—we had a discussion, a further discussion during the interim, I was trying to clarify exactly what he said to me in regard to his opinion and I would like now to ask Captain Phillips what he did say in regard to the opinion?

"A. Prior to the convening of the Court you asked me if I had an opinion on the man. I replied, 'no, I didn't', anticipating it would be asked in the Court whether I had personally seen the man and I intended to answer truthfully that I had not seen the man. I did not mean to imply that I did not have an opinion about the report on the man."

The foregoing were all of the witnesses introduced by the Government. To summarize, five lay witnesses testified that the defendant appeared normal and acted rationally. A psychologist gave his impression that the defendant could perceive the difference between right and wrong and that he was competent to stand trial. A psychiatrist, who had not examined the defendant, on the basis of the written report of the psychologist, concurred in the conclusions reached.

The defendant introduced three witnesses.

Steve Watkins, an attorney who had served four years with the Federal Bureau of Investigation, was requested by counsel retained by defendant's wife to interview the defendant. Mr. Watkins testified:

"A. In the third week of March I interviewed Ralph Argent in the Tallahassee County jail. This was pursuant to a telephone call from your office to my office where you had been retained by his wife, I believe, to get him counsel, to get him out of jail in Tallahassee which was the immediate problem. I went down to the jail to interview Ralph. I found him emotionally upset. He appeared not to have the will to want to fight; he didn't know whether he wanted me to represent him; he didn't know whether he wanted to make bail; he went as far as to start discussing, 'well, I want a divorce'; and we left the first interview with the situation that he would think about it, that he would give me a call if he wanted me to arrange for his bail and in case he wanted my firm to come in and represent him. The conclusion I reached after my first interview which was some hour or an hour and a half, it appeared that he was disjointed in his thinking. \* \* \*

\* \* \* \* \* \*

"Q. Mr. Watkins, can you tell us about any specific things, others which have already testified to, which you observed about Mr. Argent?

"A. Well, he was emotional and he appeared to be trying to remember the things; he was trying to complete the past period of from four to six weeks in my conversation as to where he had been, what checks he had written, and exactly to reconstruct what he had done during that period of time. He made the statement to me— and I have notes here of the original interview—that he was able to piece together from his conversation with the F B I agent, whom he had given the signed statement to, and as well as he had gone through his credit tickets and he was able to reconstruct that he had been in Montgomery, Dothan,

Pensacola, DeFuniak Springs, Tallahassee, and he knew that he had been in Charleston, South Carolina, and transferred from out of there. '* * "

Dr. William Evans, III, a physician, was at the time of trial Flight Surgeon stationed at the Naval Air Facility in Washington, D. C. As to his training and experience in psychiatry, Dr. Evans testified:

"A. I initially attended a four months intensive course in psychiatry at the United States Naval Hospital at Bethesda, Maryland. This was immediately upon entering the Navy. Following this I was sent to the United States Naval Hospital in Charleston where I was a member of the neuropsychiatric staff for about three years, psychiatric referrals, primarily to give diagnosis and make arrangements for disposition and treatment.

\*   \*   \*   \*   \*   \*

"Q. In your duties have you had experience with neuroses and melancholia from Navy distress situations occurring in the military service?

"A. Yes sir.

Dr. Evans had examined the defendant some nine months prior to the date of the check. Of that examination, he testified:

"Q. Do you remember when that was approximately and under what circumstances?

"A. Yes, it was on May 22nd, 1961. He was referred to me by a medical officer at the Mine Craft Base in Charleston. The medical officer called me on the phone and pointed out that he did not feel this was a medical referral, that there was not anything significantly wrong with the defendant but that his Administrative Officer, the

Commanding Officer of Mine Squadron 8, was requesting it.

"Q. At the time that you examined Mr. Argent can you tell us what medical history he gave you?

"A. Well, he was a little bit lost himself as to why he was being sent to see a psychiatrist. He acknowledged that he had developed certain feelings of anxiety and anger and frustration in his present duties.

"Q. Did he tell you anything about the facts related to his duty immediately prior to the time that you saw him?

"A. Yes, he mentioned a rather complicated, somewhat unorthadox (sic) situation, whereby he had been recently transferred to take the place, from one mine sweeper to another mine sweeper, to take the place of a chief engine man who had recently committed suicide.

"Q. Do you remember whether a chief engine man did commit suicide?

"A. It was second-hand knowledge which was discussed in the psychiatric department there due to the fact, and I assumed it was a fact.

"Q. At the time that you examined Mr. Argent can you tell us what you found, what you observed?

"A. In brief, my opinion, other than the symptoms of anxiety and hostility manifested by certain digestive complaints, loss of appetite, indigestion, difficulty in sleeping, new changes which according to him were not appropriate for him; that is, easily losing his temper under minor stresses, increased irritability. In other words, these were principally the symptoms and the

signs which I saw. I felt that they probably were appropriate to the situation in which he was working; that is, I felt these were due to the environment. He explained to me that the ship to which he had recently been sent had innumerable mechanical problems and I just felt that his responses to this seemingly deteriorating ship were appropriate to a person giving a past history of being a fairly perfectionistic, rigid, striving to please, type of person."

Dr. Evans had read the defendant's confession, his testimony on the hearing of the proffered plea of nolo contendere, his Naval service records which were offered in evidence, had talked with Argent, had read Dr. McClary's deposition, and had talked with Dr. McClary. He further testified:

"Q. Doctor, do you have an opinion, based upon reasonable medical certainty and based upon your consultations with Mr. Argent, and your examinations of him, both before and presently, and consultations with other doctors whose knowledge of his Navy record, confession, and the Court record of August 7th, 1962, and the testimony here this morning, whether or not Mr. Argent is suffering from such perverted and deranged condition of his mental and moral faculties as to render a person incapable of distinguishing between right and wrong or unconscious at the time of the nature of the act he is committing or where though conscious of it unable to distinguish between right and wrong and know the act was wrong, yet his will by which we mean the governing power of his mind has been otherwise [than] voluntarily completely destroyed [so that] his actions

[are] not subject to it and are beyond his control, specifically, the crime with which he is charged?

"A. Of course, at the time I examined him clinically, or the two times I did see him clinically, I had no knowledge of any crimes. I believe this was before, in fact before the alleged crimes and so naturally I did not gear my questioning at that time to bring out these facts you have mentioned. However, upon reading the record, talking with Dr. McClary, and talking with Mr. Argent, since that time I certainly think it conceivable, if not likely, he did suffer certain dissociative phenomena, and that whereas he undoubtedly, as you pointed out, know (sic) the difference and did know the difference between right and wrong. I would say I am accurate in saying he did indeed have this disassociative state that he probably had difficulty in adhering to the right, if indeed he could adhere to the right."

Dr. Allen R. McClary was Assistant Professor of Psychiatry at Johns Hopkins University School of Medicine. He testified to his educational preparation as follows:

"A. I am a college graduate with a BS degree from Oregon State College, graduated in medicine with an MD degree from the University of Oregon Medical School. Residency training at St. Elizabeth's Hospital in Washington, D.C., attendance at the William Alanson White Psychiatric Foundation, a graduate from the Baltimore Psychoanalitic Institute, two years of residency training at Johns Hopkins Hospital.

*     *     *     *     *     *

"A. I am on the staff of Johns Hopkins Hospital, Spring Grove State Hospital, Seton Institute, Shepherd and Enoch Pratt Hospital.

\* \* \* \* \* \*

"Q. Have you had any special training or experience in the field of characterizing military medicine?

"A. Yes, I was in the medical department of the Army of the United States for three plus years and in the course of that time I took some special training in military psychiatry in Brook Army Medical Center and was Chief of the psychiatric service for two and a half years in the army."

At the request of counsel, Dr. McClary had examined Argent on two separate occasions in June 1962, separated by three or four days, during which time Dr. McClary had him examined also by a clinical psychologist. He testified at length concerning the history of Argent's troubles and the details of his examination. Counsel then questioned him as follows:

"Q. Doctor McClary, based on your examination of Mr. Argent, the consultations with various doctors, the testimony here today, and your review of the trial record, the confession, the Navy records, do you have an opinion based on reasonable medical certainty whether or not Mr. Argent was suffering from such perverted and deranged condition of the mental faculties as to render him incapable of distinguishing between right and wrong, or unconscious of the nature of the act he has committed, or whether conscious of the nature of the act able to distinguish between right and wrong and know the act was wrong his will, by which I mean the governing power of his mind had been otherwise [than] voluntarily so completely destroyed that his actions are not subject to and are beyond his control?

"A. I do.

"Q. What is your opinion?

"A. I believe that Mr. Argent was suffering from a mental condition that rendered him in the terms of the case that you have just defined, not unable to distinguish right from wrong in this sense of the word, but unable to make his behavior conform with what he would if one asked him at this time assert to be correct behavior."

On cross examination Dr. McClary testified:

"Q. How did Mr. Argent's condition when you examined him before these series of crimes, how did that square with the McNaughton Rule?

"A. According to the McNaughton Rule he would be responsible.

"Q. He would be responsible?

"A. Yes."

On redirect examination Dr. McClary testified:

"Q. Doctor, is there any question in your mind, your professional opinion, that Mr. Argent could not control his behavior to conform to the law—let me restate the question—is there any question in your mind that Mr. Argent could not control his behavior to conform to the law at the time of the writing of this check?

"A. No."

The defendant had moved for a judgment of acquittal at the close of the Government's case. He again moved for a judgment of acquittal at the close of all of the evidence. Both motions were de-

nied.[2] After hearing oral arguments of counsel, and taking a recess, the district judge announced his findings of fact and conclusions of law, concluding as follows:

"Considering all of these facts here, the Court concludes and finds as a fact that at the time of this matter that this defendant was legally accountable for his acts by either standard. That he was aware of what he was doing and that he was not suffering from any derangement of his facilities which would cause him to do this thing in an ungoverned manner or in an episode of unconsciousness or inability to conform."

After finding the defendant guilty, the Court read the pre-sentence report and then suspended the imposition of sentence and placed the defendant on probation for a period of three years.[3]

The test of a knowledge of right and wrong as applied to the particular act was established in the great leading case of McNaghten, 10 Clark & Finn 200, decided in 1843 before the English House of Lords. "It was decided by the judges in that case that, in order to entitle the accused to acquittal, it must be clearly proved that, at the time of committing the offense, he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did, not to know that what he was doing was wrong." [4]

As to the burden of proof, the Supreme Court of the United States repudiated the rule of the McNaghten case in Davis v. United States, 1895, 160 U.S. 469, 486, 487, 488, 16 S.Ct. 353, 358, 40 L.Ed. 469, where it was said:

"In a certain sense it may be true that where the defence is insanity, and where the case made by the prosecution discloses nothing whatever in excuse or extenuation of the crime charged, the accused is bound to produce some evidence that will impair or weaken the force of the legal pre-

2. We do not mean to imply that a motion for judgment of acquittal is necessary in a case tried without a jury on a plea of not guilty. See Hall v. United States, 5 Cir. 1960, 286 F.2d 676; Gatewood v. United States, 1953, 93 U.S.App.D.C. 226, 209 F.2d 789; United States v. Maryland & Virginia Milk Producers' Ass'n., Dist. Ct.D.C., 1950, 90 F.Supp. 681.

3. The defendant had been discharged from the Navy on June 26, 1962, as of which date his service record bore the following endorsement: NOT RECOMMENDED FOR REENLISTMENT due to involvement with civil authorities. ARGENT has been informed that he is not recommended for reenlistment for this reason. REENLISTMENT MAY NOT BE EFFECTED WITHOUT PRIOR APPROVAL OF THE CHIEF OF NAVAL PERSONNEL." The defendant testified on the hearing about the proposed plea of nolo contendere that,
"Q. How long have you been in the Navy?
"A. Well, on the 26th of June, I finished up eighteen years three months and sixteen days active duty.
"Q. How long do you have to serve for retirement?

"A. Actually, only one year because for retirement purposes the Navy has almost four months of build-up time which I would get free.
"Q. In the event of finding you guilty what effect will that have on your retirement?
"A. I talked to Rear Admiral John McCay, Jr., in Washington, and Captain Adolph Miller. Admiral McCay is head of the Training Section and a former Commanding Officer of mine, and Captain Miller is in the Disciplinary Section of the Bureau of Naval Personnel, and also, a former Commanding Officer, and I told them all about it when I was up to see Dr. McClary, and they are both of the opinion that I would not be, under any circumstances, permitted to reenlist and finish my year's time out if I was found guilty."
The probable result therefore is that, though sentence has been suspended, the finding of guilt deprives the defendant of the opportunity to re-enlist and serve the additional year to earn his retirement from the Navy.

4. Parsons v. State, Ala.1887, 81 Ala. 577, 2 So. 854, 857; see also, Davis v. United States, 1895, 160 U.S. 469, 479, 480, 16 S.Ct. 353, 40 L.Ed. 499.

sumption in favor of sanity. But to hold that such presumption must absolutely control the jury until it is overthrown or impaired by evidence sufficient to establish the fact of insanity beyond all reasonable doubt or to the reasonable satisfaction of the jury, is in effect to require him to establish his innocence, by proving that he is not guilty of the crime charged.

\*     \*     \*     \*     \*     \*

"Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defence is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question from the time a plea of not guilty is entered until the return of the verdict, is whether upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged. \*  \*  \*"

On the second appeal in that case, the Court adhered to this test of the burden of proof, and also approved an instruction which substantially added to the right and wrong test of McNaghten the ability to refrain from doing wrong, viz.:

" 'The term "insanity" as used in this defence means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where, though conscious of it and able to distinguish between right and wrong and know that the act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control.' "

Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750.

■ This Circuit, en banc, has adhered to the burden of proof rule established in the first Davis case and the test of criminal responsibility approved in the second Davis case.[5] In that case, we made it clear that:

. "The district court further erred in its charge in requiring the defendant to adduce proof *both* that he did not know the difference between right and wrong *and* that he was unable to refrain from doing wrong. *Either* condition existing at the time of the commission of the act and as the result of some mental defect or disease was sufficient to make the defendant not guilty. \*  \*  \*" 232 F.2d at 276.

In the present case, as has been noted, the defendant has never denied that he knew the difference between right and wrong, but has pin-pointed his defense as an inability to refrain from doing wrong in the commission of the act charged. On the other hand, the Government, up to the time of submission of the case for decision by the district court, has stubbornly adhered to the old McNaghten test of knowledge of right and wrong as applied to the particular act. The Government's two expert witnesses restricted their testimony to that test. The defendant's two experts were cross-examined on the theory that the McNaghten test was still exclusive. Even in his argument submitting the case for decision

5. Howard v. United States, 5 Cir. 1956, 232 F.2d 274.

by the district court, Government counsel insisted:

"\* \* \* I think counsel apparently must not have been listening because this case was tried strictly on the McNaughton Rule doctrine. Of course, you said that they could develop any case that they wanted to for the record, but their case was weakened, actually diluted, when their own doctor said on the stand that the man knew right from wrong, in his opinion, at the time the crime was committed, and that is exactly the issue before the Court. Our doctors examined him for that purpose and they came up with a written report which was subscribed to by Captain Phillips; I don't think the Court can kick his testimony out for his long experience, that he knew right from wrong at this time."

The defendant introduced substantial and convincing evidence of two recognized and apparently impartial psychiatrists that as the result of some mental defect or disease he was unable to refrain from doing wrong in the commission of the act charged. The Government made no effort to meet its burden of proof on that issue by examination or re-examination of expert witnesses. The only testimony which might possibly be considered to justify the inference that the defendant was able to refrain from doing wrong in the commission of the act charged is that of the five lay witnesses offered by the Government, who testified that the defendant appeared normal and acted rationally. Any inference from that testimony that the defendant was able to refrain from doing wrong in the commission of the act charged is weakened, if not destroyed, by the testimony of Dr. Evans,[6] and by the deposition,[7] and testimony at the trial,[8] of Dr. McClary.

■■ The question of taking the case from the trier of facts where as a matter of law there was reasonable doubt as to the defendant's sanity was for the decision of the district court as a court.[9] The evidence of guilt in the present case does not measure up to the high standard required.[10]

■ The length of this opinion is out of all proportion to the amount of the check, but is appropriate in holding erroneous the findings of the trial court, and is further justified by the importance of this case to the defendant. (See n. 3, supra). No good purpose would be served by ordering a new trial.[11]

6. "Q. Is it consistent, doctor, with your opinion that he could be very articulate and seemingly intelligent and capable in thinking at the time of the commission of these things, or not?
"A. Yes."

7. "Q. Would the type of disorder that you found that he had at the time of the commission of the crime, would an ordinary lay person, either a law enforcement officer or some other responsible person, be able to recognize the disorder in Mr. Argent in consulting with him or questioning him?
"A. Probably not. The only evidence is that one might see, if you knew him well, one might notice tension or some change in his mood, but a casual contact would not make any special recognition of any illness."

8. "Q. Doctor, there has been testimony here from time to time in these situations, Mr. Argent was lucid, seemingly using good judgment, perhaps scheming, planning various normal appearing things, would you comment on that in view of this ailment you found that he is suffering from?
"A. This is not at all a marked effect. This is not where the defect lies in the area of the ability to think. There is no abnormality of thought or anything like that. The abnormality is in the area of checking against realistic judgment. This is where the defect lies. So that his behavior as observed by everyone that has testified, he seemed perfectly normal and certainly could carry out a very complicated piece of behavior and it is not at all inconsistent with this."

9. United States v. Westerhausen, 7 Cir. 1960, 283 F.2d 844, 853; Fitts v. United States, 10 Cir. 1960, 284 F.2d 108, 112, 113.

10. Riggs v. United States, 5 Cir. 1960, 280 F.2d 949, 955.

11. See 28 U.S.C.A. § 2106; Bryan v. United States, 1950, 338 U.S. 552, 70 S. Ct. 317, 94 L.Ed. 335; Sapir v. United States, 1955, 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426.

The judgment of conviction is reversed, and the case is remanded to the district court with directions to vacate that judgment and to enter an order granting the defendant's motion for acquittal and a judgment acquitting the defendant.

Reversed and remanded.

JONES, Circuit Judge (dissenting in part).

The judgment and sentence are reversed because there is an absence of evidence that the appellant, knowing the difference between right and wrong, was able to refrain from doing wrong. I do not disagree. The majority stresses Howard v. United States, 5 Cir., 232 F.2d 274, where an en banc court, by an opinion written by the author of the opinion of the majority here, reversed for a new trial. I would follow the precedent there and reverse for a new trial here. The majority opinion states that no good purpose would be served by ordering a new trial. I would suggest that a good purpose would be served by permitting testimony to be introduced as to the appellant's ability to refrain from doing wrong so that the issue might be determined. If this issue and the other relevant questions should be resolved adverse to the appellant, a judgment of guilt might result which would be free from error. This Court, in an opinion written by the writer for the majority here, has said:

"* * * since the Government may possibly have further evidence, the cause is remanded for further proceedings * * *." Guevara v. United States, 5th Cir. 1957, 242 F.2d 745.

See also White v. United States, 5th Cir. 1954, 216 F.2d 1; Gondron v. United States, 5th Cir. 1957, 242 F.2d 149; Steele v. United States, 5th Cir. 1955, 222 F.2d 628. Unless it can be said that the Government cannot possibly have further evidence, the cause should be remanded for a new trial. I cannot join in so saying.