**Lester Alvin BUATTE, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 18685.**

United States Court of Appeals
Ninth Circuit.

March 2, 1964.

Thelton D. Beck, Phoenix, Ariz., for appellant.

C. A. Muecke, U. S. Atty., and Richard C. Gormley, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before POPE, MERRILL and BROWNING, Circuit Judges.

POPE, Circuit Judge.

The appellant was charged in an indictment returned in the court below with murder in the first degree in the death of Alice Secody, fourteen year old daughter of a Navajo sheep herder, on the Navajo Indian Reservation within the Indian country in the. District of Arizona. (18 U.S.C. § 1111, applicable under 18 U.S.C. § 1152.) After trial to a jury, a verdict of guilty of murder in the second degree was returned; judgment was entered accordingly, and the appellant was sentenced to life imprisonment. From this judgment appeal is now taken.

The evidence of the Government in the case against the appellant tended to show that on Saturday, April 7, 1962, appellant was hitchhiking on Highway 89 in Arizona toward Salt Lake City, Utah. He left a truck on which he had caught a ride about two o'clock in the afternoon. He approached a tent which belonged to the father of the girl who was killed, and when he came to the tent he found there three children, Alice Secody, Dan Secody, aged ten, and Melinda Secody, aged five. The parents of the children were then absent. Defendant asked for a drink of water which

Dan gave to him and defendant sat down in the tent. He then went across the tent to where Alice was sitting and placed his hand on her hip. She threatened to call the police. Defendant then went out of the tent, found a hammer and struck Dan on the head. Dan was then shot between the eyes and Alice shot in the head, as a result of which she died.

The evidence tended to show that the defendant then ran from the tent toward the highway and ran along the highway; he then flagged down a truck and rode on it a distance of several miles to a place called Gap Trading Post. The truck driver and a companion who was riding in the truck stopped at the trading post for coffee and defendant went in and had coffee himself after which he returned to the truck. At that time police arrived and he was placed under arrest. Subsequently the truck was searched and a pistol and bullets belonging to defendant were found in a tarpaulin on the truck where defendant had been sitting. The evidence was sufficient to warrant a finding that the bullet removed from the head of Alice was of a calibre fitting the pistol. Traces of human blood were found on defendant's clothing.

The defendant's testimony was that he had no recollection of the events accompanying the attack on the children and that the last thing he remembered was that he was standing in the middle of the road trying to get a ride.

Under the view which we take of this case the only specification of error which we need to note is the one concerning the claimed error of the court in denying the motion for judgment of acquittal made at the conclusion of all of the evidence. The motion was based upon the defendant's contention that, in view of the evidence of the defendant's insanity which was produced by the defense, the Government failed to make a case for the jury by proof that the defendant was legally sane at the time of the homicide.

The question of the defendant's insanity was raised by extensive testimony offered on behalf of the defense during the trial. Thus, Dr. Baker, a medical doctor and psychiatrist with a considerable background of experience in that field, who had examined the defendant four times between November 30, 1962, and December 17, 1962, the date of the witness's testimony, testified that at the time of the examination defendant was suffering from a severe form of schizoid personality, a condition of personality where the individual is very withdrawn, isolated, afraid of contacts with other individuals, at odds with normal daily living and who has some difficulty in distinguishing what is real from what is fantasy. Such a person has a tenuous hold on reality and from time to time will slip into psychosis, back and forth; he is given to psychotic episodes characterized by inability to distinguish between reality and imagination. Such episodes are a commonly known type of psychiatric illness. Schizophrenia is a severe mental illness or psychosis, it was testified.

On the examination of the defendant the doctor found several gaps in his memory the most prominent of which was the period on April 7, 1962, when the killing occurred. The period which the doctor testified to extended from 3:30 to approximately 5:30 in the afternoon of that date. The testimony was that a person suffering from such a psychotic upset would experience a loss of memory or amnesia. Results of tests which the doctor used in examining the defendant were such as to rule out the probability of defendant's feigning or pretending loss of memory. The doctor noted that before this period of loss of memory defendant was in an extremely anxious state; that he was terrified to find himself out on the desert facing the coming of night, and that the thought of isolation would serve to render him in a condition of near panic. Under such a condition of stress, a psychotic break of the kind described by the doctor would be likely to occur. It was the opinion of the witness that such a psychotic break, or state of insanity, was precipitated at the time when the events described in the indictment oc-

curred. Such a person in that condition would have no appreciation of the nature and quality of his actions; he would have no ability to distinguish between right or wrong. It was the opinion of the doctor that the defendant did have such a psychotic break during that period, followed by amnesia.

Other expert testimony was produced tending to establish the same condition. A Dr. Keith, psychiatrist at the United States Medical Facility for federal prisoners at Springfield, Missouri, had examined defendant between June and September, 1962, at a time when defendant was committed there for the purpose of ascertaining whether he was mentally able to proceed to trial. He described defendant's mental condition as a schizoid personality disorder in much the same manner as Dr. Baker had done. A witness, Professor Smith, Professor of Psychology at Arizona State University, a clinical psychologist with a record of clinical internship at Langley Porter Clinic at San Francisco and a post doctoral Fellow at the Menninger Clinic, had examined defendant shortly before the trial. He found defendant to be a "simple schizophrenic", an individual engaged in drastic withdrawal from contact with other people, and withdrawn from reality with thoughts governed largely by fantasy. In his opinion the condition was a chronic one of long standing. He found that the defendant had many memory gaps, and he was of the opinion that the defendant was unable to recall certain of the events of April 7, 1962. He was of the further opinion that defendant's memory was faulty, blurred and confused, that he was as schizophrenic on April 7 as he was at the time when the examination took place, and at that time the defendant would have no awareness of the rightness or wrongness of his act.

What confirms the strength of this testimony is the fact that the defendant had a record of service, both in the Navy and in the Army, showing severe mental impairment. The armed services records relating to these matters were received in evidence. They showed a history of erratic behavior characterized by absence without leave and repeated periods of hospitalization caused by apparent irrational behavior. The Naval record showed hospitalization after an absence without official leave and incapacity after drinking after-shaving lotion. These records showed complaints on his part of being continually ridiculed by others; that he was uncomfortable in crowds and given to day dreaming with a fear of his mind failing. A notation was made "Diagnosis changed to schizophrenic reaction, n. e. c." He was found unfit for duty and ordered transferred to the Oakland Naval Hospital for treatment. This occurred in the month of July, 1952. The following month his record showed "Impression: It would seem that this is basically a schizoid personality with superimposed borderline mental deficiency. However, further investigation is indicated. Shock work-up will be instituted." He was finally discharged from the Naval service. The defendant enlisted in the Army in 1955. On June 18, 1957, he was stopped when walking out the main gate of the Army Post at Fort Carson, Colorado, when he failed to heed a signal to stop. He would not speak and his identity was unknown. He was finally identified as the defendant. He was admitted to the hospital as a case of "hysteria type". The diagnosis at the Medical Treatment Facility at Fort Polk, La., was as follows: "Schizophrenic reaction, catatonic type, manifested by mutism, stupor, history of AWOL and wandering in recent weeks, dilapidated appearance, confused behavior; * * *." This was July 18, 1957. On August 1, 1957, electric shock treatment was begun and he was given a total of 14 treatments during that month. He exhibited a marked improvement thereafter. He was then discharged for disability and psychiatric impairment which incapacitated him for military service.

This account of the testimony relating to defendant's insanity is sufficient to disclose that the evidence on that point was substantial and reasonably impressive. When that evidence was received

there was presented to the Government an obligation to meet the requirement stated in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, as follows: "[W]hile it was true that every man is presumed to be sane, yet whenever by the testimony the question of insanity is raised then the fact of sanity, as any other essential fact in the case, must be established to the satisfaction of the jury beyond a reasonable doubt." [1]

This challenge is particularly acute under the facts of this case. The evidence referred to posed special difficulties for the Government, for the evidence disclosed that the mental breaks into insanity which occurred in the case of this defendant (episodes which would be characterized by loss of memory, and an inability to distinguish between right and wrong) would occur at irregular intervals. In short, such mental breaks into insanity would be interspersed between more or less lucid intervals. Thus, Dr. Baker testified that "A person with this type of personality disorder, which is a form of mental illness, does not at all times present the same pattern. * * He has a very tenuous hold on reality, and from time to time will slip into psychosis, back and forth." Professor Smith also described the defendant's unstable mentality as having "a kind of waxing and waning quality about it." Dr. Keith testified that such a person "can move back and forth through the spectrum from sickness to health."

It thus appears that the Government was confronted with the most difficult task of showing that at the time of the commission of the crime here involved the defendant was in what might be called by laymen a "lucid interval". Under these circumstances it would not suffice to produce a witness to testify that a few hours before the commission of the offense the accused was acting in an apparently normal manner. What was required was some evidence that he was legally sane during the short period when the killing occurred.

This brings us to the question as to what the Government was able to produce and did produce tending to show that the accused was sane at the time in question. Without attempting to set forth all of the evidence produced by the Government, we now proceed to indicate what was the strongest testimony along this line that the Government furnished.

One Fredericks testified that on the morning of April 7, he was driving a pick-up truck on Route 89 out of Flagstaff, Arizona. He picked up a hitchhiker identified as the defendant. The witness testified that he thought he would engage his rider in conversation but noted that the defendant fell asleep. "He just leaned back there in the corner and kind of feeled relaxed. * * *" About 2 P.M. he let the defendant out of the truck and defendant said: "Well, I am going to rest here for a while." Fredericks said that when the defendant was asleep it was "a natural relaxation". "I think his conduct was natural, and, of course, I am not a judge of character." When defendant left the pick-up he was moving toward a shady place. The witness testified that when he picked up the defendant "I didn't think he was nervous, or anything."

The other truck driver testified that about 3:30 P.M. on April 7, he picked up the defendant who was "waving us down"; that the defendant "did not use a regular motion", for that purpose. Ten miles farther on they reached the Gap. The truck driver, a farmer who was riding with him, and the defendant went into a restaurant and had coffee. Similar testimony was given by the farmer who had been riding on the same truck. Neither of these witnesses gave any testimony as to any conduct of the defendant bearing upon his mental condition.

A captain of detectives testified as to his interview with the defendant after his arrest. He first talked to the defendant about 2 A.M. on the morning following the arrest and he talked with

---

1. This is an abbreviated statement of what the court held previously in the same case in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499.

him again at 2 that afternoon. Defendant acknowledged ownership of the gun which was found on the truck. He said that the last he remembered was standing at a bridge railing looking at a tent and then he was standing in the road trying to get a ride.

The manager of Yellow Cab Company at Ogden, Utah, testified that defendant had worked for that company under his direction between August, 1961, and January, 1962; he was "just a happy-go-lucky type of individual, as an average employee would be." A bartender at Wilhoit, Arizona, who saw defendant on the morning of April 6, 1962, testified that he did not observe anything unusual about defendant's behavior at that time. Similar testimony was given by a man who met and talked with the defendant at a service station in Flagstaff about the same time. A Dr. Duisberg, a physician specializing in psychiatry and neurology, examined defendant on May 18 and December 4, 1962. He testified that a person with some of defendant's background and history "might well have known the difference" between right and wrong on April 7.

On the other hand, a number of lay witnesses testified to some erratic conduct and appearance on the part of the defendant. A county jailer who first saw defendant about 11 A.M. on April 9, testified that defendant was then "very nervous, and in a dazed condition, slightly dazed, what I would call dazed." Later in November of that year, defendant returned to the same jail when he was not as nervous, even perhaps carefree. A deputy U. S. Marshal, who had transported defendant after his arrest back and forth to various jails and for interviews with his attorney, testified that as a whole defendant's "conduct was not

normal in my opinion." He said that "one time he would be very talkative to a point of distraction * * * and another time he would not say hardly a word. * * *" "He would laugh at many things that no one else would; that is, if you follow what I mean, like a child would. * * *"

Two cases relied upon by the appellant as supporting his claim that his motion for acquittal should have been granted are McKenzie v. United States, 10 Cir., 266 F.2d 524, and United States v. Westerhausen, 7 Cir., 283 F.2d 844. In each of these cases, as here, there was strong medical testimony indicating insanity on the part of the defendant at the time of the commission of the alleged offense. Lay witnesses were called by the Government and relied upon for proof of sanity. In the McKenzie case these witnesses had seen the accused near the time of the commission of the offense and testified to the effect that they noticed nothing unusual about his behavior. There the court recognized that as a general proposition qualified lay witnesses may testify as to the sanity of an accused and that in proper cases such testimony may be sufficient to carry the prosecution's burden even though there is expert testimony to the contrary. However, the court said (266 F.2d at 527): "Upon the whole, however, we are constrained to the view in this case, in which the evidence of trained and disinterested psychiatrists, whose duty it was to determine the mental condition of the defendant, is so overwhelming as to his insanity, that if the burden of proving sanity beyond a reasonable doubt has any significance at all, it was not met by the meager evidence of the prosecution. The motion for judgment of acquittal should have been granted." [2]

2. See also Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168, 170: "[T]he prosecution failed entirely to sustain its burden. It simply did not establish the sanity of the accused. The evidence on behalf of the defense was extended and impressive. To all practical intent there was no contrary evidence."

In that case defendant's common law wife with whom he had lived testified for the prosecution that nothing unusual in his actions indicated he was suffering from any mental illness and that in her opinion he was of sound mind. The Isaac case was cited with approval in Lynch v. Overholser, 369 U.S. 705, 713, 82 S.Ct.

The Westerhausen case, supra, presented a similar situation to that found in the McKenzie case. There, too, lay testimony was relied upon to meet evidence of appellant's insanity given by qualified experts. There was also a state court adjudication of insanity three months after the commission of the crime. In that respect the record there compared with the military findings relating to the defendant in this case. The court there held that appellant's motion for acquittal should have been granted by the district court.

Another case which bears considerable resemblance to the one before us is Argent v. United States, 5 Cir., 325 F.2d 162. That case, like this, presented peculiar difficulties for the Government, for the court noted and emphasized the fact that the expert witnesses had testified that an ordinary lay person observing the accused and his conduct would probably be unable to recognize the disorder which the expert witnesses found defendant to have. These doctors testified that one observing the defendant's behavior would consider that he seemed perfectly normal. Yet, the psychiatrists who testified agreed that the accused was suffering from such perverted and deranged mental and moral faculties as to render him incapable of distinguishing between right and wrong. Under such circumstances the court held that the testimony of five lay witnesses who testified that the defendant appeared normal and acted rationally was without sufficient weight to satisfy the burden of proof that was upon the Government. In that respect the case is similar to this one where even lay testimony is not available concerning the defendant's condition at the critical time of the killing.

On this record we are compelled to hold that the Government failed to produce sufficient evidence to support a finding of sanity by the jury. There is a complete absence of evidence to show defendant was sane at the critical time, namely, the period when defendant was at the tent where the killing occurred.

In view of the circumstances here present we are unable to perceive how any useful purpose could be served by ordering a new trial.[3] Accordingly, the judgment is reversed and the case remanded with directions to enter an order granting the defendant's motion for acquittal and to enter a judgment accordingly.

1063, 8 L.Ed.2d 211. In accord are: Argent v. United States, 5 Cir., 325 F.2d 162; Amador Beltram v. United States, 1 Cir., 302 F.2d 48; Pollard v. United States, 6 Cir., 282 F.2d 450.

3. What finally becomes of this defendant is a matter not within our power. See the discussion of this "regrettable void" and footnote 32, in Sauer v. United States, 9 Cir., 241 F.2d 640, 651–652.