**Schuyler Colfax BROCK, Jr., Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 24279.**

United States Court of Appeals
Fifth Circuit.

Nov. 17, 1967.

Tom B. Long, Austin, Tex., Ben A. Endlich, El Paso, Tex., for appellant.

Reese L. Harrison, Jr., Asst. U. S. Atty., Ernest Morgan, U. S. Atty., Western Dist. of Texas, Jamie C. Boyd, Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before HUTCHESON, BELL and GODBOLD, Circuit Judges.

HUTCHESON, Circuit Judge:

Appellant was convicted of mailing to President Johnson a letter threatening "to take the life of and to inflict bodily harm upon the President of the United States", in violation of 18 U.S.C. Sec. 871. It was admitted that appellant wrote and mailed the letter, promising to "shoot the president out of the Whitehouse three or four times a year, with a continuing and wearying monotony." His claim of insanity provoked the only controversy. A motion for acquittal, tendered at the close of the evidence, was denied, and the jury refused to find appellant legally insane at the time of the offense. On this appeal, the existence of evidence sufficient to warrant submission to the jury is challenged. We agree with appellant that as a matter of law the government failed to satisfy its burden of proving appellant sane beyond a reasonable doubt, and we accordingly reverse.

The offending letter, six typewritten pages in length, invited a meeting with the President for discussion of the Viet Nam war. It displayed a vigorous belli-cosity toward the President and all governmental authority. Appellant claimed control of a 1500-man guerrilla force, with both power and disposition to "strike you with bacteriological [sic] warfare, diseases and pestillences [sic] of nation-wide proportions in epidemics; the continued use of fire; the destruc-

tion of your children and teachers by bombing the schools with special explosive fire bombs * * * so that after a few years, the U. S. will be at best a 4th or 5th class power from this type of warfare alone." The letter was signed by appellant and sealed with his thumbprint. To it was appended a list of conditions requisite to ending the war being waged by appellant and his forces,[1] and a résumé of "major" sabotage operations for which they claimed responsibility, among them fires, airplane hijackings, and the assassination of President Kennedy.

Appellant's principal witness was Dr. Joseph Alderete,[2] then Chief of Psychiatry at the United States Medical Center for Federal Prisoners, to which appellant had been committed for determination of his competence. The ninety days' commitment was begun some six weeks after the letter was written. Dr. Alderete testified that during this period he personally spent five to eight hours interviewing appellant and that members of his staff were with appellant an additional few hours. Clinical psychological tests were performed and file of background information, including letters from appellant's family and Secret Service reports, was studied. The decision regarding appellant's competence was unanimously concurred in by the psychiatric personnel and the entire hospital staff at the Medical Center. This diagnoise was that appellant had a paranoid personality, characterized by undue suspicion, aloofness, envy and stubbornness. At the time the letter was mailed, appellant was suffering a paranoid reaction, classified by the witness as a major mental disorder, and manifested by delusions of grandeur, persecution complexes, and abnormal suspicions. This paranoid reaction state, Dr. Alderete concluded, rendered appellant incapable of knowing right from wrong and of conforming his actions to the requirements of law.

On cross-examination, Dr. Alderete testified that no organic brain disorder was discoverable, that appellant was highly intelligent and in good physical health. In an effort to weaken the doctor's testimony, the government developed that although the diagnosis was based on the entire volume of information, at least a part of this was comprised of appellant's assertions, some three-fourths of which had been verified. In addition, a letter referred to in the diagnostic report as indicative of mental illness was not the offending letter, but was one written by appellant to President Eisenhower in 1960.[3] Dr. Alderete testified that appellant was recovering several months after the letter was written and no longer suffered a paranoid reaction; this recovery was achieved without therapeutic treatment. In laying a predicate for the rebuttal testimony of lay witnesses, the government ascertained that the symptoms described might have existed and been observable by a layman during the several years prior to the writing of the letter.

The prosecution countered with the testimony of three laymen, each to the effect that he had never noticed any manifestation of mental abnormality on the part of appellant. The first had been an employer of appellant for more than two years, but his observations were based entirely upon an association which ended several years prior to the time in question. The second witness, a former landlady of appellant, had seen him only

---

1. They included cession of the southern states, "thus achieving political and economic independence of the damn-yankee yoke," support of the southern currency with five billion dollars of gold bullion, withdrawal from Viet Nam, termination of inquiry regarding the Klu [sic] Klux Klan, and payment to appellant of $250,-000 indemnity for "the many indignities I have suffered at the hands of the damn-yankee government."

2. The only other defense witness was the Secret Service officer who arrested appellant. He testified that at the time of the arrest he "thought he was mentally ill."

3. The government places much emphasis on this error, but we think it of little importance for the reason that the 1960 letter was of the same general tenor as that for which he was prosecuted.

twice in the year and one-half before the letter was mailed; the last occasion was a visit during the month preceding the offense which consisted of brief discussion of "the yard," his child, "and how he liked grits * * * and about me being from Georgia and his mother was too, things like that." Only the final prosecution witness was associated with appellant at a time proximate to that in question. This was appellant's employer during the year and one-half prior to the offense. He stated that he observed no abnormal behavior of appellant or any indication of inability to distinguish right from wrong. Appellant resigned when he mailed the offending letter, telling his employer that he had "other business that was pressing."

 Although it is expeditious to presume the mental responsibility of a criminal defendant, the presumption vanishes when some evidence of insanity is presented. Sanity then becomes an element of the offense charged and must be proven beyond a reasonable doubt.[4] Appellate review of the sufficiency of the evidence is never an easy matter, and the difficulty is compounded when a jury in a criminal case has reached a verdict contrary to both medical testimony and visceral reaction.[5] However, we conclude upon a review of the evidence that a reasonable doubt must necessarily have existed in the minds of reasonable jurors regarding appellant's sanity.

 We are not unmindful of the many cases holding that expert testimony, particularly that of psychiatrists, may be adequately rebutted by the personal opinions of laymen.[6] At the same time, the opinions of experts may not be arbitrarily ignored,[7] and reversal has been occasioned by insufficient evidence of sanity.[8] Although no precise standards for review have been enunciated, this court has said that some reason must be objectively present for ignoring expert opinion testimony which is sought to be rebutted only by the observations of laymen; otherwise, there is no issue for the jury. In Mims v. United States, Judge Brewster noted that some such reason would be presented.

4. Davis v. United States, 160 U.S. 469, 486, 16 S.Ct. 353, 40 L.Ed. 499 (1895); Howard v. United States, 232 F.2d 274 (5th Cir. 1956); Argent v. United States, 325 F.2d 162 (5th Cir. 1963). See Riggs v. United States, 280 F.2d 949 (5th Cir. 1960).

5. A reading of the offending letter, claiming as it does the commission of numerous crimes and carefully identifying the writer, would alone raise some doubt as to appellant's mental capacity.

6. Mims v. United States, 375 F.2d 135 (5th Cir. 1967); Breland v. United States, 372 F.2d 629 (5th Cir. 1967); Birdsell v. United States, 346 F.2d 775 (5th Cir. 1965); Brown v. United States, 351 F.2d 473 (5th Cir. 1965); United States v. Cain, 298 F.2d 934 (7th Cir. 1962); Carpenter v. United States, 264 F.2d 565 (4th Cir. 1959); Dusky v. United States, 295 F.2d 743 (8th Cir. 1961). Cf. McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847 (1962); Rollerson v. United States, 119 U.S.App.D. C. 400, 343 F.2d 269 (1964).

7. Mims v. United States, 375 F.2d 135, 143 (5th Cir. 1967).

8. Hartford v. United States, 362 F.2d 63 (9th Cir. 1966); Buatte v. United States, 330 F.2d 342 (9th Cir. 1964); Argent v. United States, 325 F.2d 162 (5th Cir. 1963); Beltran v. United States, 302 F. 2d 48 (1st Cir. 1962); Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); Fitts v. United States, 284 F.2d 108 (10th Cir. 1960); United States v. Westerhausen, 283 F.2d 844 (7th Cir. 1960); Pollard v. United States, 282 F.2d 450 (6th Cir. 1960); Hopkins v. United States, 107 U.S.App.D.C. 126, 275 F.2d 155 (1959); Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957); Wright v. United States, 102 U.S.App.D. C. 36, 250 F.2d 4 (1957); Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52 (1956). But see King v. United States, 372 F.2d 383 (D.C.Cir. 1967); Hawkins v. United States, 114 U.S.App. D.C. 44, 310 F.2d 849 (1962), where guilty verdicts were affirmed although defendant's expert testimony was uncontradicted by the government.

by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of co-operation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him.[9] None of these weaknesses is present on the record before us.

■ It has likewise been recognized that the nature and quantum of rebuttal evidence sufficient to present a jury question is to some degree determined by the strength of the case for insanity.[10] It may be that the unblemished testimony of an expert can be overcome by a significant measure of convincing and relevant [11] lay opinion. We have no such controversy here. Although three government witnesses testified, the observations of two were far removed from the time of the offense. The only clearly controverting evidence was the testimony of a single layman who saw appellant on the night the letter was mailed. This is not a strong case for sanity.

■ We do not purport to establish a rule of decision for all cases of this type. Each must be decided upon its own facts with careful attention to the weight of the evidence on each side. Rather we hold that the testimony of a single layman to rebut the opinion of a skilled and disinterested government psychiatrist, which opinion is in no way impugned or discredited, does not on this occasion pass appellate muster. The government must produce something more.

Perhaps it can do so, and we would not foreclose the possibility. Rather we reverse, and remand for another trial if the District Court believes it warranted by the government's offer of additional evidence.[12]

Reversed and remanded.

9. 375 F.2d at 143–144.

10. Dusky v. United States, 295 F.2d 743 (8th Cir. 1961); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4, 7 (1957); Hopkins v. United States, 107 U.S.App.D.C. 126, 275 F.2d 155, 157 (1959); United States v. Westerhausen, 283 F.2d 844, 852 (7th Cir. 1960).

11. Evidence of competence before and after the time in question is legally relevant. Breland v. United States, 372 F.2d 629 (5th Cir. 1967); Davis v. United States, 364 F.2d 572 (10th Cir. 1966). It is of less probative value, however, than testimony relating to the precise time in question. Obviously, the wider the time gap the less credence such testimony is given. See Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878, 888 (1957).

In addition, there is less force to a statement that nothing abnormal was observed than to a clinically based assertion of insanity. An affirmative proposition is little supported by negative observations.

12. 28 U.S.C. Sec. 2106. Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), affirming 175 F.2d 223 (5th Cir. 1949); Yates v. United States, 354 U.S. 298, 327–328, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Wyckoff v. United States, 314 F.2d 498 (5th Cir. 1963). We do this although no new trial has been requested. See Riggs v. United States, 280 F.2d 949 (5th Cir. 1960).