**UNITED STATES of America,
Appellee,**

v.

**Harold WHITE, Appellant.**

**No. 26179.**

United States Court of Appeals,
Ninth Circuit.

Aug. 20, 1971.

---

Stephen D. Miller, (argued), of Miller, Glassman & Browning, Beverly Hills, Cal., for appellant.

Larry S. Flax, Asst. U. S. Atty., (argued), Robert L. Meyer, U. S. Atty., David R. Nissen, Chief, Crim. Div., Los Angeles, Cal., for appellee.

Before MURRAH,* ELY and HUF-STEDLER, Circuit Judges.

PER CURIAM:

White was convicted by a jury on six counts of bank robbery, 18 U.S.C. § 2113 (a), and sentenced to fifteen years in prison. His sole defense in the District Court was insanity. On this appeal, he urges several grounds for reversal. Inasmuch as we agree with the contention that the evidence was insufficient to support the determination, beyond a reasonable doubt, that White was legally sane at the time he committed the robberies, we need not reach his other points.

■■ Our conclusion is compelled by the lack of any testimony or the existence of any evidence tending to show that White was legally sane according to the standards adopted by this court in Wade v. United States, 426 F.2d 64 (9th Cir. 1970). There, we held that

"'[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the * * * [wrongfulness] of his conduct or to conform his conduct to the requirements of law.'"

Id. at 71. We also held that Wade should apply to cases wherein judgments of conviction were not yet final when our Wade opinion was filed; thus, the Wade test is applicable here.

A careful review of the record reveals unmistakably that the Government failed to meet its burden of proving beyond a reasonable doubt that White was legally sane at the time of the alleged crimes. The medical evidence of mental disease was overwhelming, and the evidence of legal insanity under Wade standards was virtually uncontroverted. Moreover, such evidence of legal sanity as there was—virtually none—was predicated solely on the factors of the outdated M'Naghten rule, no longer the law in our Circuit.

Four experts, a clinical psychologist and three psychiatrists, presented opinions concerning White's sanity at the time of his alleged offenses. The psychologist had tested White when he was once confined to an institution pursuant to judicial commitment and following his

---

* Honorable Alfred P. Murrah, Senior United States Circuit Judge, Oklahoma City, Oklahoma, sitting by designation.

attempted suicide. She testified that he was psychotic, a paranoid schizophrenic "unable to distinguish reality from unreality."

Dr. Rifkind, a psychiatrist who, in an official capacity, had examined White while White was in the Federal Prison Hospital in Springfield, Missouri, expressed the opinion that White was psychotic when examined by him and that he, White, was insane when the robberies occurred. White had been committed to the Federal hospital after an original determination by the District Court that he was mentally incompetent to stand trial.

Dr. Frederick Hacker, who examined White on March 24, 1970, found that White suffered psychotic mental illness, "not being able to distinguish from right and wrong  *  *  * ."

Dr. George Y. Abe testified in December, 1969, that White was legally insane when the robberies were committed. That testimony was given during White's first trial, after which a mistrial was declared because of the jury's inability to reach agreement. In the second trial, that here under review, Dr. Abe expressed a somewhat different conclusion, stating that in the early morning hours, "probably around 3:00 and 4:00 o'clock," of the day he testified, he had finally decided that White was sane. It is apparent, however, that Dr. Abe was unsure of his conclusion and that it was related, essentially, to his understanding of the M'Naghten test.[1]

It is always regrettable when an appellate court must reverse a judgment because evidence, perhaps sufficient to support the conviction at the time it was rendered, becomes no longer sufficient because of changes in the law that the trial judge was in no position to foresee. On the other hand, it can be equally regrettable that a criminal defendant is denied the benefit of a legal defense through the accident of time and the necessarily slow pace of appellate deliberation. When his conviction is not yet final, such a denial cannot be countenanced.

■ While White's conviction must be reversed, we shall stay the issuance of our judgment for a period of sixty days. Hopefully, some concerned party, a relative or friend of White's, or the Government itself, may, within that time, successfully invoke California procedures in order that White may be confined in an institution for the mentally ill and there receive the medical attention which he so desperately needs.

When our mandate finally issues, the indictment will be dismissed. *Cf.* Buatte v. United States, 330 F.2d 342 (9th Cir. 1964).

Reversed.

1. This is shown by a portion of Dr. Abe's testimony, presented during his cross-examination in the second trial:

"Q. How much thought had you given to the opinion you first rendered?
A. The first opinion?
Q. Yes.
A. I gave it quite a bit of thought at the time and I felt at that time, as I do now, that he was mentally ill and there was probably a relationship to the offenses so *I thought that he did meet M'Naghten's Rule at that time.* But subsequently I found out the testimony indicates that he knew what he was doing, he was able to act regardless of whether he is mentally ill or not now and carry out these functions according to the test of M'Naghten.

Q. Doctor, after learning those facts *last night* from [the prosecuting attorney] we discussed the matter again and you still felt that the defendant was legally insane within the meaning of M'Naghten, that is what you expressed last night, wasn't it?
A. Yes, my thinking at that time was I felt that he knew the difference between right and wrong and also the nature and quality of the act. I think the area where I was saying 'yes' to, was he able to control his will knowing that this was wrong, knowing the nature of the act.
Q. You say you think. Was that your opinion or wasn't it?
A. Well, that was my opinion at that time until I began to think and try to justify my thinking at that time *based upon all these factors of the test of M'Naghten.*" (emphasis added).