Billy Ray **BRELAND** and Allen Ellender Chance, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 23163.

United States Court of Appeals Fifth Circuit.

Feb. 14, 1967.

---

Harry B. Friedman, Texarkana, Tex., for appellants.

H. D. Nicholson, Asst. U. S. Atty., Wm. Wayne Justice, U. S. Atty., E. D. Texas, for appellee.

Before WISDOM, COLEMAN, and GODBOLD, Circuit Judges.

COLEMAN, Circuit Judge.

These appellants were jointly indicted, tried, convicted, and sentenced to five years imprisonment for escape from the Federal Correctional Institution at Texarkana, Texas, in violation of 18 U.S.C.A. § 751. With the assistance of court appointed counsel they have prosecuted their appeal in forma pauperis. We affirm.

On April 21, 1965, Billy Ray Breland was serving a twenty-year sentence on a plea of guilty to assault to commit murder on a government reservation. Allen Ellender Chance was serving a three year sentence imposed for transporting forged securities in interstate commerce. Both men had records of prior convictions and imprisonment.

On that day, as members of a detail under the control and direction of an officer of the Institution, Breland and Chance were painting in a housing unit where prison officers lived. The foreman was out of the room for a few minutes. Upon returning he noted that the prisoners were gone. He went to the front door and observed two inmates going west. He called to them but they kept going. Of course, they had not been given permission to leave. On April 24, the escapees were apprehended under an old house about twenty miles from the Institution. One of them began crawling away but a few rounds fired under the house had the desired results, and both men were taken into custody.

At the trial, the sole defense was insanity. Upon request of counsel, a competent psychiatrist had been appointed by the Court, prior to trial, to examine both men and report on their mental condition. He was called to the witness stand and gave testimony in their defense.

■ It is here urged that the trial court erred in not granting the motion for judgment of acquittal at the close of the evidence for the government. This contention is wholly without merit. In fact, after the prosecution made its prima facie showing, the escape was never denied by any witness at any point in the trial.

It is next complained that the admission of the following testimony constituted reversible error:

Q. Officer—Excuse me, Warden Goodwin, did you have any conversations with these men after you had regained custody of them?

A. On the way back we had a conversation; and, also, after they returned to the institution, I interviewed each one of them.

Q. At any time that you had conversations with these men, or any time they were in your direct custody there in your view and observation, did any —either one or did both of them make any statement to you that would in any manner indicate to you that they were not of sound mind?

Objected to as lacking the requisite warning.

THE COURT: To the question asked, I will overrule your objection.

MR. NICHOLSON: You may answer it if you will now.

Now, understand the Court's ruling. You are not to give any substance of any statement they gave to you. The question is, was there anything about any statement that they made that might indicate to you that they didn't know what they were talking about— or that they didn't have full control of their faculties?

A. No, sir.

Later on, the Warden was back on the stand, at which time he testified that the defendants appeared to be of sound mind, were able reasonably to weigh their acts, and conversed in a coherent manner as he was returning them to prison and as he talked with them on a subsequent occasion. The following transpired:

MR. FRIEDMAN: (interrupting) I'm going to object to this because there is no showing they were given the statutory warning before they made any statement.

THE COURT: You raised the question of their sanity. I think he can testify as to anything they might have said or done to reflect upon their condition—the condition of their minds at this point.

I will overrule your objection.

Q. Relate, if you will, for the jury what you can recall of what these men told you about the way that they had escaped, and where they might have

gone and what they might have done before they were apprehended.

A. They told me about taking the route down to—down '59, and how they had become mixed up in the dark of night—and crossed a bridge and headed back towards Texarkana, thinking they were going in the opposite direction—until they crossed the bridge—and then discovered they had reversed themselves.

They also discussed their apprehension at this house where Sheriff Dowd apprehended them. And Breland told me that he went to—for a rest on an old abandoned mattress in the house—and that he changed his trousers there. And I brought the trousers home they left in this house.

So, it was all coherent as far as I could determine. Nothing incoherent about it.

Appellants argue that these statements were inadmissible under the *McNabb* rule [McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943)]. They cite United States v. Haupt, 7 Cir., 1943, 136 F.2d 661 and United States v. Hoffman, 2 Cir., 1943, 137 F.2d 416.

 The difficulty with this position is that this is not a *McNabb* situation. Breland and Chance were not individuals suspected of a crime and under arrest for investigation or prosecution. They were escaped felons and their recapture was entirely legal. The right of the Warden to their custody could not be questioned. Therefore, the *McNabb* rule does not apply, United States v. Carignan, 342 U.S. 36, 45, 72 S.Ct. 97, 96 L.Ed. 48 (1951); Palakiko v. Harper, 9 Cir., 1953, 209 F.2d 75, 94.

The gravamen of the offense of which these appellants stand convicted was leaving the Institution without lawful permission. That they did this is not disputed. Their statements to the Warden did not concern this vital point but was limited to what they supposedly did after they were successfully at large. If, however, the above quoted testimony is reasonably subject to different construc-

tions and could, by inference, be construed as an admission of guilt of the offense charged, the statements were nevertheless admissible under *Escobedo* standards, Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

 The conversation under attack occurred while the Warden was taking the escaped felons back to prison after they had been turned over to him by arresting authorities. The Warden was testifying as a rebuttal witness on the insanity issue. The testimony was clearly offered as a predicate to support his lay opinion as to the mental state of the appellants. Since appellants were tried on October 18 and 19, 1965, *Miranda* standards do not apply, cf. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If *Escobedo* standards apply to escaped convicts lawfully retaken, they were certainly met in this case. See Johnson v. New Jersey, supra, that *Escobedo* applies to statements (a) elicited (b) by the police (c) during an interrogation (d) where the investigation has begun to focus on a particular suspect, (e) "the police carry out a process of interrogations that lends itself to eliciting incriminating statements" (f) "the suspect has requested and been denied an opportunity to consult with his lawyer" and (g) the police have not effectively warned him of his rights to remain silent. There is no evidence here that either appellant requested or was denied an opportunity to consult with counsel.

Being of the opinion that they are not presented by this appeal we do not pass upon the following questions which have occurred to us in our consideration of this case:

(A) If a defendant pleads not guilty by reason of insanity and has made incriminating statements which are under *Escobedo* standards, inadmissible to prove the substantive elements of the crime, is the statement nevertheless admissible on the issue of insanity?

(B) Where the defendant pleads insanity and an illegally obtained statement is allowed into evidence, but under the *Fahy* rule [Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed. 2d 171 (1963)] there is no reasonable possibility that the statement contributed to a determination of the substantive elements of the crime, but it might have affected determination of the insanity plea, does this require reversal?

■ In ascertaining a defendant's mental condition it is proper to receive evidence of the condition of his mind during a reasonable period both before and after the offense if it has any tendency to throw light on the condition of his mind at the time of the act charged, Hart v. United States, 1942, 76 U.S.App. D.C. 193, 130 F.2d 456.

■ The sanity of the appellants at the time of their escape being placed in issue, it became the government's burden to prove sanity beyond a reasonable doubt. Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

The defense adduced one lay and one expert witness on the issue. The lay witness, William T. Booker, Jr., an inmate at Leavenworth, where the appellants are now in prison, testified that Chance on two or three occasions would interrupt what he was doing and begin " * * * looking off in space like he didn't know where he was at." Booker said Chance often changed the subject abruptly in conversation. Booker opined Chance was not of sound mind. Booker did not know anything about the other defendant, Breland.

Dr. Thomas, a psychiatrist, diagnosed Breland as a paranoid chronic schizophrenic. In his opinion, Breland could not tell right from wrong.

Dr. Thomas surmised Chance had "epilepsy of a traumatic type", with possible "psychomotor or petit mal seizures". He could not give an opinion whether Chance knew right from wrong, but admitted it was possible he did not.

A physician who had been a general practitioner with the U. S. Public Health Service, Dr. Banta, had been the medical officer at the Texarkana penitentiary. He had examined Breland at least once and Chance "rather frequently". Nothing indicated to Dr. Banta that either defendant was of unsound mind.

Several lay witnesses for the prosecution were questioned regarding the appearance and behavior of Breland and Chance before and after their escape. None of these witnesses noticed anything unusual, different, or abnormal about the defendants. Each witness gave the opinion the defendants were sane and knew right from wrong.

Appellants object only to the testimony by the Warden, on the ground he stated no facts as basis for his belief.

■ Appellants and appellee cite State cases on the issue of insanity. It seems plain, however, that this is a question of federal law. The federal rule regarding lay, as opposed to expert, testimony on the issue of insanity has been well stated:

This and other courts have said that expert opinion as to insanity rises no higher than the reasons upon which it is based, that it is not binding upon the trier of the facts, and that lay testimony can be sufficient to satisfy the prosecution's burden even though there is expert testimony to the contrary. [Citations omitted]. Dusky v. United States, 8 Cir., 1961, 295 F.2d 743, 754.

■ The lay witness must be qualified by having had at least some assuring opportunity of observation of the defendant. Kaufman v. United States, 8 Cir., 1965, 350 F.2d 408, 414.

■ Before giving his opinion on appellants' sanity, the warden had testified that he had returned them to the Institution after their capture some twenty miles away, that he had conversations with them during the trip back to Texarkana and later at the Institution, that at no time did either of them do any act or make any statement that indicated an unsound mind. He further testified that during his years as warden

of several federal prisons he had interviewed many persons. The testimony of the warden was therefore particularly competent under the rule of Evalt v. United States, 9 Cir., 1966, 359 F.2d 534.

Affirmed.