Russell **ALEXANDER**

v.

C. Murray **HENDERSON**, Warden, Louisiana State Penitentiary.

Civ. A. No. 15685.

United States District Court,
W. D. Louisiana,
Lafayette Division.

Aug. 19, 1971.

Warren D. Rush, Lafayette, La. (Court-Appointed), for plaintiff.

Knowles M. Tucker, Dist. Atty., 16th Judicial District, New Iberia, La., for defendant.

PUTNAM, District Judge.

In a trial which began March 14, 1966, Russell Alexander was convicted of the murder of Mrs. Aline Buillard Carter and sentenced to death. He has petitioned for a writ of habeas corpus in this court, alleging that his conviction and sentence are unlawful for two reasons: (1) his conviction was based on confessions which should not have been received in evidence, and (2) veniremen were excluded from his jury for cause simply because they voiced general objections to the death penalty, in violation of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). But, to borrow the words of Judge (now Justice) Blackmun, "As is common in these cases, no assertion is made here that [Alexander] was innocent of the state crime with which he was charged." United States ex rel. Miner v. Erickson, 428 F.2d 623, 625 (8 Cir. 1970).

EXHAUSTION OF STATE REMEDIES

Petitioner's conviction was affirmed by the highest State court. State v. Alexander, 252 La. 564, 211 So.2d 650 (1968). Petitioner filed an application for a writ of habeas corpus in the State court in which he had been convicted, presenting only the *Witherspoon* issue. That application was denied without a hearing on the ground that petitioner, by failing to object to the dismissal of the scrupled veniremen, had acquiesced in their exclusion from the jury. His writ denied, he applied to this court for relief. We issued our Opinion and Order of May 15, 1970, directing the petitioner to apply again to the State court. We "requested and strongly recommended" that the State court hold an evidentiary hearing to determine (1) whether or not veniremen were challenged for cause in violation of the *Witherspoon* rule, and (2) whether or not applicant and his counsel at the trial had deliberately bypassed the State procedural vehicle for preserving his objections to jury selection. The State court again denied petitioner's application without a hearing, giving as its reasons (1) the same reasons for denying the original application, and (2) the fact that the federal court had assumed jurisdiction. We therefore ordered that an attorney be appointed to represent Alexander and that an evidentiary hearing be held in this court.

At the hearing, it was established that petitioner was represented at his trial by five court-appointed attorneys. He testified that he was ignorant of the technical aspects of the law, and that he relied solely upon his attorneys to make the proper objections. The transcript of the voir dire shows that no objections were made by him or his attorneys to the exclusion by the court of seven scrupled veniremen for cause.

After the hearing, petitioner's appointed counsel recognized that another issue could be raised in support of the habeas petition, namely, the issue of whether the petitioner's confessions had been properly admitted in evidence during his trial. Alexander was ordered to exhaust his State remedies on this issue, whereupon he filed a third application in the State court. The application was again denied without a hearing, and the Louisiana Supreme Court denied writs.[1]

■ The first question which we must decide is whether this failure to object constituted a deliberate bypass of State procedural remedies. As the Supreme Court emphasized in Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed. 2d 837 (1963), "A choice made by counsel not participated in by the petitioner does not automatically bar relief. Nor does a state court's finding of waiver bar independent determination of the

question by the federal courts on habeas, for waiver affecting federal rights is a federal question." The Court further stated that the proper test of waiver is whether there was "an intentional relinquishment or abandonment of a known right or privilege." Since petitioner's trial took place two years before *Witherspoon* was decided, and since his counsel were apparently unable to predict the Witherspoon result, we find that petitioner did not intentionally relinquish a known right or privilege. Accordingly, we conclude that there was no deliberate bypass of a State procedural remedy, and that petitioner has exhausted his State remedies on the *Witherspoon* issue.

The facts surrounding the giving of the confessions were developed by the trial court out of the presence of the jury, and are reflected in the State court transcript of the trial. The Louisiana Supreme Court passed on this issue on the appeal of the conviction, and affirmed. Concluding that State remedies had been exhausted on the "confessions" issue, we held a second evidentiary hearing in this court.

THE FACTS [2]

On Friday, August 27, 1965, a niece and several friends of Mrs. Aline Buillard Carter became concerned because none of them had heard from Mrs. Car-

---

1. The refusal of the State court to hold an evidentiary hearing on the Witherspoon issue is difficult to understand. The State trial judge is in a much better position to judge issues such as the bypassing of State remedies, credibility of witnesses who testified at the trial, and other questions usually involved in habeas petitions. Federal courts do not want the unpleasant duty of setting aside State convictions which often results because of the State court's refusal to protect its own judgments as the law requires. In fact, 28 U.S.C.A. § 2254 gives great weight to the State court findings in post conviction hearings and requires the applicant for the writ to carry the burden in any subsequent federal proceeding to "establish by convincing evidence" that the factual determination by the State court was erroneous.

2. We have been furnished a complete transcript of the evidence received during Alexander's trial and all rulings of the Court, whether in the presence of the jury or not. The transcript of the voir dire examination of the jurors consisting of 172 pages, filed by the State in connection with the Witherspoon issue is separate and identified as Joint Exhibit I. We will identify the trial transcript, consisting of 440 pages, as Exhibit II for purposes of this Opinion. The facts recited here surrounding the commission of the crime and Alexander's confessions are the impressions of the Court gained from its study of Exhibit II. References to pages of these transcripts will occasionally be made during the course of this Opinion using simply Exhibit I or Exhibit II to designate the source.

ter for several days. Upon checking Mrs. Carter's home, they discovered broken china and what appeared to be blood stains on the floor. At that point they called the Sheriff, who began an investigation.

Russell Alexander was known to Deputy Roy Bonvillain to have been working at a garage which abutted Mrs. Carter's property, and was also known by him to be a sexual deviate who had been recently released from the penitentiary, having just finished serving a term for a previous burglary of Mrs. Carter's home during which he had stolen some of her undergarments.

Alexander was apprehended about 4:15 p. m. on August 27 at a farm where he was working. He was picked up by Deputies Bonvillain and Durand. There was no warrant for Alexander's arrest at this time. Alexander was not warned of his rights, was taken to the parish jail, booked for investigation, and put into a cell.

About six o'clock p. m., Alexander was interrogated by Bonvillain and Durand as to his whereabouts from Sunday through Thursday. The interrogation took place in the radio room, and lasted 45 minutes to an hour. Alexander was not warned of his rights, but did not admit knowledge of any crime at this time.

About seven o'clock p. m., Alexander was taken by Officer Martin and Chief of Police Romero to a small interrogating room, where he was asked to disrobe so that the officers could search him for scratches. Several marks were found, but Alexander explained them by saying that he had scratched himself while picking corn. He was not cooperative during this search, and refused to answer most of the questions put to him. Officer Martin testified that the Chief spoke in his usual rough voice and sometimes placed his hand on Alexander's shoulder. Alexander alleges that he was beaten at this time, but the trial judge ruled that the evidence did not support his contention. Ex. II, 184. The search lasted about ten minutes. Alexander was not advised of his rights, but made no incriminating statements at this time.

About nine o'clock p. m., Alexander was allowed to speak to his mother. She, Alexander, and Deputy Bonvillain sat in a hallway while they spoke. Mrs. Alexander urged her son to tell the truth if he knew anything about Mrs. Carter. Alexander eventually admitted to his mother that he had stolen a car, and then asked Bonvillain if he could speak to the officer alone. Bonvillain suggested that they use his office. Alexander then said that his mother could go along, too. The three went to Bonvillain's office, where Alexander admitted to Bonvillain that he had killed Mrs. Carter. The District Attorney, Knowles Tucker, came into the room about that time. He testified at the second evidentiary hearing that he was concerned over the possibility that Mrs. Carter might still be alive, and that her life might be saved by prompt action. Alexander said he would show them where she was. Delaying only long enough to allow Alexander to put on warmer clothing and to render aid to Mrs. Alexander, who fainted as they left Bonvillain's office, the police immediately arranged for transportation.

On the way to the site, Alexander started talking to Bonvillain about exactly what had taken place on the day of the crime. Alexander told Bonvillain that on Monday afternoon, he decided to go to Mrs. Carter's residence. When he arrived, he observed that no one was home. After walking up the driveway and onto the carport, he entered the house through an open door. He went through several rooms to Mrs. Carter's bedroom, and there started going through some of her belongings. He removed a pistol and some undergarments. He masturbated three times as he fondled the underwear. He then heard a car door slam, and hid in the bathroom closet. Mrs. Carter entered her home, went into her bathroom, and was changing her shoes when she turned and saw Alexander standing in the closet. She ran for the telephone, but Alexander cut the wire. She fled again, but Alex-

ander caught up with her in the dining room, picked up a hammer, and hit her on the back of the head with it. She fell to the floor, and as she was on all fours coming back up, he hit her again. He then tried to have sexual intercourse with her, but could not complete the act, so he removed her underwear and masturbated again. Then he put her body into her car and drove out to the oil field, where he disposed of it. (Ex. 2, pp. 61–62, 196–202.)

On the trip during which Alexander related these events, he was handcuffed, and spoke only to Bonvillain. Alexander led the police to an oil well site outside of town, to a spot within 75 feet of the body.

On the return trip, Alexander told Bonvillain where to find the bloody shirt, undershirt, and the pistol which he had taken from Mrs. Carter's home. These items were later found on the basis of this information.

When the group arrived at the jail, Alexander was served with an arrest warrant and was booked for murder. He was then given food. He was advised of his rights for the first time. The warning had been written out by the District Attorney, and it was read to Alexander by Officer Durand. Durand also wrote the warning into the written statement. He called his mother to ask if she would get him a lawyer, and she refused. Alexander then decided to go ahead with the statement. The statement was written about midnight by Officer Durand. It was read back to Alexander in the presence of Bonvillain and Dr. Yongue, the Coroner. Alexander indicated that he understood it, and signed it.

The oral and written confessions were introduced in evidence at the trial. The written confession, as it was read to the jury, is as follows:

"8–27–65, 11:58 P.M.

I have been advised that I am under arrest, charged with the murder of Aline Buillard Carter, and have been shown the warrant and affidavit.

On or about Monday, August 23, 1965.

That this is a capital offense for which I may receive the death penalty.

I have been advised that anything I may say can be used against me and that I do not have to make any statement, and that I am entitled to a lawyer and can consult with him before giving this statement, and that I do not have to give any statement thereafter, and I am aware that any statement which I make must be completely free and voluntary on my own part without any promises, threats or violence whatsoever.

I do now make this statement without having been subjected to any threat or bodily harm and realize the full consequence of my action.

I am going to wait awhile but I want to talk to my Mamma right now.

The officers let me call my Mamma on the telephone.

I went to that house about 5:30 Monday afternoon and nobody was there. I went in the house from the side door under the carport. After I got in the house, I was all puzzled up, and I walked around. Heard a car drove in. I put me back of that little cross door. The first thing I went for was her panties and I started playing with myself. I had that hammer in my hand and I got scared when she was turning around. I hit her. I hit her twice. I started to run off, then I stopped and went by the screen door and I got scared and then I got scared again. Then I got real bold and then I put her body in the front seat and drove to Section 28. I had gone fishing back there. I left her there.

I went with her at the house when she was on the floor. I didn't tear her clothes off. I just put her down in the oil field, then I left. I came back to town. I stopped at my Uncle Ben's. I turned by Uncle Henry's house first. I threw the shirt off near Uncle Ben's. I put the little small gun under the house near the

pillar. I got my shirt and drove off and went home. I went home with Uncle Henry and slept at Uncle Ben's house." Tr. 252–54.

After signing the statement, Alexander told the police where the hammer could be found.

### THE EFFECT OF ESCOBEDO

Alexander's trial began March 15, 1966. Therefore he was tried after Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but before Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). As is well known, Miranda is not retroactive. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Thus only Escobedo is applicable to petitioner's claim. The Supreme Court has recognized that the scope of Escobedo is narrower than that of Miranda; otherwise Miranda would have been made effective as of the date of the Escobedo opinion. Johnson v. New Jersey, supra, 384 U.S. at 734, 86 S.Ct. at 1781. The holding of Escobedo, as summed up by Judge Coleman in Breland v. United States, 372 F.2d 629, 632 (5th Cir. 1967), is as follows:

Escobedo applies to statements (a) elicited (b) by the police (c) during an interrogation (d) where the investigation has begun to focus on a particular suspect, (e) "the police carry out a process of interrogations that lends itself to eliciting incriminating statements" (f) "the suspect has requested and been denied an opportunity to consult with his lawyer" and (g) the police have not effectively warned him of his rights to remain silent.

Prior to the Miranda opinion, the term "focus" was not well understood by the courts. This accounts for Chief Justice Warren's explanatory footnote in Miranda to the effect that custodial interrogation "is what we meant in Escobedo when we spoke of an investigation which had focused on an accused." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706, n. 4. However, even agreeing that the investigation had "focused" on Alexander, we

believe that this fact alone does not automatically require a finding that Escobedo was violated. For, as stated by Judge (now Chief Justice) Burger in Kennedy v. United States, 122 U.S.App. D.C. 291, 353 F.2d 462, 464 (1965):

"Of course the police investigation had begun to 'focus on a particular suspect'—the Appellant—when the victims identified him at the scene of the crime; and no doubt this confrontation was a 'critical stage' in the course of events, but that is not the whole story. These words from the Escobedo text are not to be construed out of the context of the Court's opinion; they must be read in light of the framework and the facts of the cases from which they are taken—and with a modicum of common sense. It was not the mere fact of 'focus on a particular suspect * * in custody' but that focusing followed by an unwarned confession from a 'process of interrogations' after 'the suspect has requested and been denied an opportunity to consult with his lawyer'—who was at that moment trying to see and counsel him—which was found to violate Escobedo's Sixth Amendment guarantee of counsel. It is the combination of these elements, not simply the 'focus' of investigation, which is the basis of Escobedo [378 U.S. 478 at 490–491, 845 S.Ct. 1758, 12 L.Ed.2d 977]."

Opinions from the Fifth Circuit have particularly stressed that petitioners who were tried after Escobedo but before Miranda must show that they requested and were denied the assistance of counsel in order to fall within the ambit of Escobedo. See Sellars v. Beto, 430 F. 2d 1150 (5th Cir. 1970); Sellers v. Smith, 412 F.2d 1002 (5th Cir. 1969); Love v. State of Alabama, 411 F.2d 558 (5th Cir. 1969); McDonald v. Beto, 405 F.2d 884 (5th Cir. 1969); Mills v. United States, 380 F.2d 335 (5th Cir. 1967); Hintz v. Beto, 379 F.2d 937 (5th Cir. 1967); Breland v. United States, 372 F.2d 629 (5th Cir. 1967). Contra, Collins v. Beto, 348 F.2d 823 (5th Cir. 1965).

See also Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

We find from an examination of the State court transcript (Exhibit II), and the testimony taken at our evidentiary hearings that at no time did Alexander request the assistance of counsel at the interrogations, nor did the police deny him access to counsel. He did call his mother before giving the written statement to ask her if she would secure the services of an attorney for him, but she said no. It must be remembered that the State was not required to furnish free counsel at interrogations prior to *Miranda*, and that decision is not to be accorded retroactive effect.

Alexander alleges further that his rights were violated in that he was not advised of his rights prior to being interrogated. However, the Fifth Circuit has held quite clearly that *Escobedo* did not require the officers to advise a suspect of his constitutional rights prior to interrogating him; this requirement was not established until *Miranda*. See Sellars v. Beto, supra; Sellers v. Smith, supra; State of Texas v. Payton, 390 F. 2d 261 (5th Cir. 1968); Matthews v. United States, 367 F.2d 156 (5th Cir. 1966), cert. denied, 386 U.S. 994, 87 S. Ct. 1311, 18 L.Ed.2d 340 (1967); Gamble v. Beto, 363 F.2d 831 (5th Cir. 1966).

We conclude that *Escobedo*, supra, affords the applicant little solace, and proceed to consider whether or not the confessions should have been excluded on other grounds.

## VOLUNTARINESS OF THE CONFESSIONS

■ As was eloquently stated by Mr. Justice Frankfurter in Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961):

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If

it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

The Supreme Court has held that in determining the voluntariness of a confession, the court must consider the "totality of circumstances." Frazier v. Cupp, supra, Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

When the issue of admissibility of the confessions was submitted to the trial judge during the state court hearing, he discussed *Escobedo* and concluded that it did not apply since (1) the proceedings had not reached the accusatory stage, (2) the defendant had not requested counsel, and (3) warnings were not required. (Ex. II, p. 101.) As to voluntariness, he concluded that Alexander had not been questioned for an inordinate length of time and that he had been adequately fed. He held further that there was no coercion involved in Mrs. Alexander's requests that her son tell the truth. The judge concluded that the confessions were completely voluntary.

However, when it appeared that counsel for the defense wanted to present further evidence, the judge withheld his ruling. The additional evidence was concluded on the following day, at which time the judge withdrew his previous reasons, (Ex. II, p. 182), and substituted new findings. On the question of inducement, the judge found that although Deputy Bonvillain had promised to help Alexander, the promise extended only to small favors, such as giving him food, clothing, cigarettes, etc., and that Bonvillain had not made this promise to induce the confession, and in fact had fulfilled the promise. He found also that Alexander's contention that he had been beaten by the police was unfounded. He held again, without citing *Escobedo*, that

warning of rights was not an absolute prerequisite to the admissibility of a confession. He concluded that the confession had been voluntarily given.

Some of the judge's rulings obviously depend on credibility choices which he was called upon to make. The choices he made were not clearly erroneous. Accepting his credibility choices, we undertook a complete re-examination of the trial transcript, and considering this evidence along with the evidence taken at our second hearing, we conclude, as did the trial judge, that under the totality of circumstances the confessions were voluntary. Alexander was treated extremely well at the jail. He was not held incommunicado, but was allowed to see his mother. He was not denied the use of the telephone. It was Alexander himself who requested an opportunity to speak to Bonvillain in private. Bonvillain gave him the opportunity, and Alexander voluntarily admitted that he had killed Mrs. Carter. He continued to volunteer information to Bonvillain during the ride out to the spot he had hidden the body and back. Even after being warned of his rights, he voluntarily signed the written confession and then continued to volunteer information by telling the police where he had thrown the hammer.

Alexander testified that when he was told that he had a right to consult a lawyer, he thought it meant a "pay" lawyer. There is nothing in the record that was told to him by any of the officers at the scene that would bring about this conclusion. Moreover, as pointed out above, *Escobedo* did not require the State to provide counsel during investigations prior to *Miranda*. Additionally, Alexander did not testify or offer any evidence that he would have requested a lawyer. The entire record shows that

once he determined to tell the officers what he had done he was a veritable fountain of information.

We hold, as did the State court, that the confessions were voluntary.

## THE WITHERSPOON ISSUE

Petitioner contends that the *Witherspoon* rule was violated in that veniremen were excluded for cause from his jury simply because they expressed general objections to the death penalty. At the time of petitioner's trial, Article 798 of the Louisiana Code of Criminal Procedure provided:

It is good cause for challenge on the part of the state, but not on the part of the defendant, that:

(1) The juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional;

(2) The juror tendered in a capital case has conscientious scruples against the infliction of capital punishment; or

(3) The juror would not convict upon circumstantial evidence.

This statute was later amended to conform to the *Witherspoon* mandate by Act No. 13 of the Extra Session of the Louisiana General Assembly, 1968.[3]

The Supreme Court made it clear in *Witherspoon* that it was not the mere existence of such a statute, nor its interpretation by the State courts, which was important, but rather the manner in which it was applied to the jury venire in the case at hand. 361 U.S. at 522, 88 S.Ct. at 1777, n. 21. See also Segura v. Patterson, 402 F.2d 249 (10th Cir. 1968). The first Louisiana decision interpreting *Witherspoon*, State v. Turner, 253 La. 763, 220 So.2d 67 (1969),

3. As amended, paragraph (2) of Article 798 now reads:
"The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; or * * *"

seemed to indicate that this state might follow the broader rule that the mere existence of the statute would invalidate the sentence, but later decisions have made it clear that the voir dire transcript must govern. State v. Benjamin, 254 La. 49, 222 So.2d 853 (1969); State v. Hudson, 253 La. 992, 221 So.2d 484 (1969).

The Witherspoon opinion stated two exceptions to the rule against exclusion for cause of scrupled veniremen: they may be excluded if they make it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." 391 U.S. at 522, 88 S.Ct. at 1777, n. 21.

There was testimony at our first evidentiary hearing to the effect that all of the veniremen remained in the courtroom within hearing distance of the interrogation of the individual veniremen, who were called up three at a time. Here, unlike *Witherspoon,* there was no systematic exclusion of forty-seven veniremen. Rather, it appears from the voir dire transcript, Exhibit I, that both the prosecutor and the trial judge were very careful to ascertain whether a scrupled venireman's feelings about the death penalty would interfere with his ability to bring in a verdict which would result in the death penalty. The question repeatedly asked by the prosecutor was, "If the State does prove its case beyond a reasonable doubt and the circumstances warrant, *would you and could you* bring in a verdict that would cause the judge to have to render such a judgment against the accused?" In most instances the answer was "Yes". But in every case in which a venireman indicated opposition to the death penalty, the court inquired further into the strength of the venireman's convictions.

A good example is provided by the examination of Mr. Jones (Ex. I, p. 20 et seq.). After Mr. Jones indicated that he did not believe in capital punishment, the State challenged him for cause. The court refused to excuse him automatically, but persisted in questioning him as to his scruples against capital punishment:

"Q. That is what the District Attorney asked you. If, after this trial is over, you are convinced beyond a reasonable doubt that this accused did commit the crime of murder as alleged in the indictment, could you render a verdict that would cause him to be sentenced to death. That is the question. That question means that you would have to be convinced beyond a reasonable doubt before you would be asked to render such a verdict. Now, you are being asked could you render such a verdict if the evidence shows that he was guilty of murder beyond a reasonable doubt. Could you?

A. I guess so.

BY THE COURT: The Challenge is refused."

Another venireman who indicated that he had some conscientious scruples against the infliction of the death penalty, Mr. Ruffin, was initially accepted by both sides (Ex. I, p. 124), and was subsequently excused upon a peremptory challenge by the defense (Ex. I, p. 132).

The transcript of the voir dire reveals that seven veniremen (six of whom were examined as regular jurors and one as an alternate juror) were excused for cause on account of their answers to questions about the death penalty. Mr. Hall was excused on the basis of the following exchange:

"Q. Do you have conscientious scruples against capital punishment?

A. (Mr. Hall) Yes, sir.

Q. You couldn't vote to bring in a verdict that would cause the judge to have to sentence a man to the electric chair?

A. (Mr. Hall) No, sir.

Q. No matter what crime he committed?

A. (Mr. Hall) No, sir." (Ex. I, p. 121)

Mr. Hall's exclusion for cause obviously fell within the first exception to the *Witherspoon* rule. We are likewise convinced that the trial judge dismissed Mr. Barr (Ex. I, p. 62), Mr. Rybiski (Ex. I, p. 64), Mr. Charles (Ex. I, p. 65), Mr. Foster (Ex. I, p. 83), and Mr. Guzzetta (Ex. I, p. 159) only after satisfying himself that each of these veniremen's beliefs would prevent him from returning a verdict which would result in capital punishment.

On the basis of the voir dire transcript, it cannot be said that the "State crossed the line of neutrality," 391 U.S. at 520, 88 S.Ct. at 1776, nor that this jury did not "express the conscience of the community on the ultimate question of life or death," 391 U.S. at 519, 88 S. Ct. at 1775.

For the foregoing reasons, the application for a writ of habeas corpus filed by the petitioner, Russell Alexander, is denied.

The Court expresses its thanks to counsel for accepting appointment, without compensation, to represent Alexander in his applications here and in the State court. We express the hope that this representation continues on appeal. While it is somewhat unusual to do so, if an appeal is taken this Court will issue a certificate of probable cause.

The stay of execution previously entered in this case will be extended pending appeal or expiration of the delays for taking same.

Counsel for the State will forthwith prepare and present an appropriate decree in keeping with the views herein expressed. The Clerk will not enter judgment until such decree has been signed and filed.