*790 WELCH, Judge,
dissenting.
In affirming Russell’s conviction and in holding that the jury had objective reasons for disregarding the extensive expert testimony establishing that Russell suffered from a severe, life-long mental disorder that rendered him unable to appreciate the nature and quality or wrongfulness of his actions when he killed Anderson, the majority has interpreted long-standing legal principles in such a way that no defendant will be able meet the legal standard necessary to prove that he or she is not guilty by reason of mental disease or defect. The record in this case established two significant points: first, the evidence presented at Russell’s trial proved by clear and convincing evidence that “at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts,” see § 13A-3-1, Ala.Code 1975; second, the record established that the jury,, with no objective reason, arbitrarily ignored the opinions of the expert witnesses, who provided overwhelming and undisputed evidence of Russell’s mental disease or defect. This case is one of the extremely rare cases in which a conviction must be overturned because it is against the overwhelming weight of the evidence. Therefore, I dissent.
The majority has set forth the relevant legal principles, including § 13A-3-1, Ala. Code 1975 — the statute defining the parameters of the insanity defense, the presumption of sanity, and the standards by which an appellate court reviews a jury’s decision to disregard expert opinion regarding a defendant’s mental state. The majority has also set forth some of the relevant facts. However, I believe that the majority has failed to set forth all of the relevant facts, and I believe that the majority has incorrectly applied the law to the facts. In order to adequately assess the evidence presented and the jury’s rejection of the expert testimony regarding Russell’s longstanding mental disorder, a more thorough discussion of the evidence is necessary.
The majority’s discussion of the experts’ testimony failed to included many details about the severity and longstanding nature of Russell’s mental disorder. Dr. Patricia Pilkinton testified for the defense that she was a psychiatrist at Taylor Hardin Secure Medical Facility, a maximum-security hospital. She stated that she was a full-time employee of the State of Alabama and was an independent evaluator — not hired by either the prosecution or the defense. Dr. Pilkinton stated that she evaluated Russell several times before trial and that he was a patient under her care from July 2006 to November 2007. Dr. Pilkinton performed her evaluations pursuant to a court order.
Dr. Pilkinton testified that Russell’s admission examination, which was performed by Dr. Denise Perone, a psychiatrist at Taylor Hardin, revealed that Russell had a “psychosis not otherwise specified,” meaning that Russell had psychotic symptoms, that he was paranoid and not in contact with reality, and that he was having visual and auditory delusions. At the time, he also had bad body odor and a long beard, and he was not maintaining his personal hygiene.
Dr. Pilkinton stated that because Russell was being treated at Taylor Hardin, it would have been difficult for him to feign his psychotic symptoms because Taylor Hardin is a hospital with an observation staff on duty 24 hours a day, 7 days a week. Dr. Pilkinton stated that staff members at Taylor Hardin always evaluate new patients for malingering. Staff members observe the patients’ day-to-day interactions, observing them on camera *791 when the patients are unaware that they are being watched.
Dr. Pilkinton testified that Dr. Perone became ill, that Dr. James Hooper began seeing Dr. Perone’s patients, and that Dr. Hooper treated Russell for six months. Dr. Hooper maintained that Russell had a “psychosis not otherwise specified” as well, and treated Russell with antipsychotic medications for his hallucinations and delusions. Dr. Hooper filed several forensic-status reports with the trial court; those reports stated that Russell was suffering from a serious mental disease or defect.
Dr. Pilkinton testified that Russell was next transferred to her care. Dr. Pilkin-ton stated that, when Russell shot Anderson, he was suffering from a severe mental defect that interfered with his ability to appreciate the nature and character of his actions. Dr. Pilkinton testified that she believed Russell had schizophrenia and that he had probably suffered from that mental illness for years without being diagnosed and treated. She testified that schizophrenia is a brain disorder, that it has different phases, and that it takes time to diagnose. Dr. Pilkinton also explained that schizophrenia is a life-long disorder and that in the first phase of the disease when the patient is young, the patient often seems normal. The second phase involves antisocial behavior, dropping out of school, an inability to hold a job, and even an inability to take care of one’s personal appearance. Dr. Pilkinton stated that the patient’s family usually notices this behavior, but the patient does not. The next phase involves acute symptoms, and usually treatment at a psychiatric facility because patients have delusions or exhibit erratic behavior or aggression. Dr. Pilkinton stated that although the behaviors may get better for a short period, schizophrenic patients experience an overall decline. In the final phase of schizophrenia patients appear to have dementia and seem vacant, much like patients with Alzheimer’s disease. Dr. Pilkinton believed that Russell demonstrated this common schizophrenic progression downhill from working in the military, to losing his nursing license, to losing a janitorial job at a Wal-Mart store.
Dr. Pilkinton testified that Russell was acutely psychotic and very anxious when she treated him. She testified that Russell had told the nurses at Taylor Hardin several times a day that he believed that he was being poisoned. Russell told the Taylor-Hardin staff that the jailers at the Etowah County jail had put pills in his food to poison him or to induce him to perform homosexual acts. Dr. Pilkinton stated that it was difficult to get Russell to the dining room to eat with other residents. Russell continued to claim, even while he was being treated at Taylor Hardin, that he was receiving messages through the television. Dr. Pilkinton stated that Russell often talked to himself when no one else was present. Russell told Dr. Pilkinton that his attorney was conspiring with other attorneys and with the judge to take an electronic device that he had invented and make money from it. Dr. Pilkinton testified that Russell described the shooting of Anderson the same way each time he related the events to her, even if he was exhibiting acute symptoms of schizophrenia at the time that he gave the description. The consistency in Russell’s description was significant, Dr. Pil-kinton testified, because it indicated to her that Russell was not malingering. Russell told her that he was at the American Legion Post in Gadsden and that he received messages through the television that someone was going to kill him. Russell told her that a man at the club whom he had seen before but did not know made a hand gesture toward him that Russell interpreted to mean that the person had been sent *792 to kill him. Dr. Pilkinton stated that this was characteristic of someone with schizophrenia because a schizophrenic person finds significance in things in his environment that no one else finds. Russell said that he killed the man because he believed that the man had been sent to kill him and that he feared for his life. I note that the explanation of the shooting Russell gave to Dr. Pilkinton was the same explanation Russell gave in his statement to the police one day after the shooting. Russell always maintained that he had received messages through the television before the shooting and that he acted out of fear for his life.
Dr. Pilkinton found it significant that Russell calmly walked away from the scene of the crime, and that he went to a movie after the shooting. In fact, Dr. Pilkinton noted that Russell wandered away from the scene — indicating he was not trying to elude the police or to hide, but that he simply left the area. Dr. Pilkinton stated Russell’s plan to dispose of the gun the day after the shooting did not demonstrate that Russell appreciated the wrongfulness of his conduct; rather, Dr. Pilkinton testified, “I don’t think that it does. I think that not answering the door — hiding things is entirely consistent with somebody who is paranoid and we certainly see that in people that we work with.” (R. 373-74.) Dr. Pilkinton further testified that it would not be unusual for a schizophrenic to hide a weapon if the person believed others were conspiring against him.
Dr. Pilkinton stated that after Russell came under her care she prescribed a different antipsychotic medication and that Russell thereafter began to show improvement in his symptoms and to take care of his personal hygiene. After several months of treatment, Dr. Pilkinton believed that Russell was competent to stand trial. Dr. Pilkinton testified that if Russell stopped taking his medication, his symptoms would reappear within a few months or a year.
Russell told Dr. Pilkinton that he did not have any schizophrenic symptoms before the date of the shooting, but that he had felt depressed and had sought help at the Veterans Administration (“VA”) hospital. Dr. Pilkinton stated that it is not unusual for schizophrenics to fail to realize that they are exhibiting psychiatric symptoms. Dr. Pilkinton attempted to acquire Russell’s VA records, but the VA denied having any records for Russell. Dr. Pilkinton testified that she had not located any psychiatric or military records for Russell, but that this did not change her opinion that Russell had a severe mental illness. Dr. Pilkinton stated that the records would have only supplemented her specific diagnosis of the type of schizophrenia from which Russell suffered. She explained the certainty of her diagnosis:
“My heart of hearts is that Mr. Russell has schizophrenia. And I’ve worked with people with schizophrenia extensively. That’s an area of interest of mine and that’s what I teach at the University. And I believe that that’s what he has. And I believe that that influenced his behavior, has dominated his life for many years. And unfortunately we didn’t pick that up. He probably went undiagnosed for a very long time and that it was his delusions and his paranoia that lead him to — ”
(R. 387.)
Dr. Pilkinton further testified:
“In working with people with schizophrenia, treating people with schizophrenia extensively in state hospitals and private practice, this is a picture of schizophrenia. And I believe that his actions were motivated by paranoia, by this feeling of persecution, the feeling *793 that he was going to be imminently harmed or killed, and this is entirely consistent with what I see from other patients that I work with with major mental illness like schizophrenia. So this is what I do as my day-to-day work, what I spend most of my time doing.”
(R. 387-88.)
Finally, Dr. Pilkinton stated that a person who has a first-degree relative with schizophrenia has an increased risk of developing schizophrenia. Evidence at trial indicated that Russell’s sister had unidentified mental-health issues.
Dr. James Hooper testified for the defense that he was the director of medical and psychiatric services at Taylor Hardin. Dr. Hooper testified that he, like Dr. Pil-kinton, was an employee of the State of Alabama and was not an expert retained by Russell. He also stated that his job was to give the court an impartial opinion of Russell’s mental state. Dr. Hooper stated that he diagnosed Russell as having a “psychosis not otherwise specified.” (R. 408.) Dr. Hooper stated that Russell had paranoid delusions while he was under Dr. Hooper’s care and that Russell repeatedly stated that he believed that the FBI was communicating to him through the television. Dr. Hooper treated Russell for six months, and Russell showed no signs of improvement during that time. Dr. Hooper stated that it was very unusual for the staff members at Taylor Hardin to see someone who really was delusional and that when this occurred the staff members attempted to keep the patient in the hospital. Dr. Hooper stated that Russell truly had been delusional while he was at Taylor Hardin. Dr. Hooper testified that he was initially not sure whether Russell’s mental health was ever going to improve. However, when Dr. Pilkinton changed Russell’s medication Russell responded well enough to be considered competent to stand trial, Dr. Hooper said.
Dr. Hooper testified that Russell’s recitation of the details regarding Anderson’s shooting was consistent. Russell stated that Anderson had threatened him and was going to kill him, and Russell stated that he had received messages through the television from the FBI. Dr. Hooper stated that the behavior he observed in Russell was indicative of someone with a mental illness. Dr. Hooper stated that Russell’s hiding from the police and attempting to dispose of the weapon were consistent with Russell’s delusion that there was an FBI conspiracy against him. Dr. Hooper testified that he believed that Russell was suffering from a mental disease or defect at the time of the shooting and that the mental illness prevented him from appreciating the nature and character of his actions.
Dr. Hooper also stated that people with mental illnesses often have bad hygiene. With medication, Russell’s personal hygiene improved, and Russell began to realize that he might have a mental illness.
Dr. Hooper stated on cross-examination that hiding a gun and avoiding the police were actions consistent with someone who knew he had committed a wrongful act. However, Dr. Hooper also stated that he did not believe that those behaviors were inconsistent with Russell’s mental illness because Russell suffers from paranoia. Dr. Hooper stated on redirect examination that Russell has a global paranoia and that he is afraid of everyone; the global paranoia caused Russell to isolate from others and to sometimes talk to himself while sitting alone. Dr. Hooper stated that these behaviors manifested in Russell long before Russell shot Anderson and that Russell had suffered from a mental illness for quite some time before the shooting.
It is also significant that Russell initially was declared incompetent to stand trial *794 and that it was only after extensive treatment with antipsychotic medicines that he was declared competent to stand trial. The record reflects that in August 2003, approximately six months after he was arrested, the trial court ordered an examination of Russell’s competency to stand trial and an examination of Russell’s mental state at the time of the offense. The case was continued in May 2004 for a forensic evaluation and was continued twice in 2005 pending results of the forensic evaluation. Following a competency hearing in 2005, the trial court ordered that Russell be committed to the care of the Department of Mental Health because he was unable to assist his attorney in his own defense. Forensic evaluation reports about Russell’s mental state were filed with the court by psychiatrists with the Department of Mental Health during 2006 and 2007. In November 2007, the trial court ordered that Russell be released from the custody of the Department of Mental Health because Russell had been declared competent to stand trial.
Testimony about Russell’s longstanding mental illness, his mental deterioration pri- or to the shooting, and his apparent inability to interact with others or to maintain employment or his own residence was consistent. The defense presented extensive and uncontradicted testimony from two unbiased experts about Russell’s longstanding psychosis and their opinion that Russell was suffering from a mental disease or defect at the time of the shooting. In spite of the uncontradicted and unre-butted testimony presented at trial, the majority holds that the jury could have reasonably concluded that Russell was sane when he shot Anderson. The majority offers only the barest rationale for its decision, stating:
“[T]he jury had ‘objective reasons’ for disregarding [the experts’] testimony. There was evidence from which the jury could have concluded that Russell appreciated the nature and quality or wrongfulness of his actions. As stated above, witnesses testified concerning Russell’s actions during and after the murder and his attempt to hide the gun he had used to kill Anderson.”
45 So.3d at 789 (emphasis added). I disagree.
The majority correctly states that the law creates a presumption of sanity for every person over the age of 14 years and that Alabama’s appellate courts have held that a jury deciding the weight of the evidence regarding proof of insanity may reject even uncontradieted expert testimony. However, a jury’s right to reject expert testimony about a defendant’s mental condition is not unbridled; rather, the jury’s rejection of expert testimony is evaluated to determine whether the jury arbitrarily rejected expert testimony or whether the jury had an objective reason to disregard the testimony. The majority quotes Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998), in which this Court examined cases establishing factors an appellate court should consider when reviewing a factfinder’s decision to disregard an expert’s opinion about a defendant’s mental condition in favor of the observations of laypersons. As the majority noted, in assessing the factfinder’s decision to disregard the experts’ opinion, a court on review should consider:
“(1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;
“(2) possible bias in the experts’ appraisal of the defendant’s condition;
“(3) inconsistencies in the expert’s testimony, or material variations between experts; and
“(4) the relevance and strength of the contrary lay testimony.”
*795 Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir.1985).
An evaluation of the evidence in light of the foregoing factors demonstrates no objective reason for the jury to have disregarded the experts’ testimony about Russell’s insanity.
1. The correctness or adequacy of the experts’factual assumptions
Dr. Pilkinton and Dr. Hooper based their opinions on repeated examinations and evaluations of Russell over a span of many months while Russell was confined in Taylor Hardin Secure Medical Facility, where he was under constant observation by the medical staff. Dr. Pilkinton testified that during the year and a half that Russell had been assigned to her unit at Taylor Hardin, she had had daily contact with and the opportunity to observe Russell. The psychiatrists had the benefit of the consistent reports from staff members regarding Russell’s anxious and paranoid behavior, his poor personal hygiene, and his unwillingness to participate in group activities with other patients. Russell’s abnormal behavior and delusions continued for many months after he was placed at the facility, in spite of treatment that included antipsychotic medications.
The majority notes that Russell was admitted to Taylor Hardin more than three years after the shooting and that Dr. Pil-kinton had acknowledged that it would have been beneficial to have evaluated Russell immediately after the shooting. Dr. Pilkinton also testified, however, that she did not believe she would have reached a different conclusion about Russell’s mental condition even if she had seen Russell sooner after the crime. Both psychiatrists were convinced that Russell suffered from a longstanding and severe mental illness at the time of the shooting.
The majority notes that there was no documentation indicating that Russell suffered from or was treated for mental illness before the shooting. However, the fact that the experts were unable to obtain records for any previous psychiatric treatment did not alter their opinion regarding Russell’s mental state and cannot support the jury’s rejection of their expert opinion. Dr. Pilkinton testified that Taylor Hardin had requested treatment records from the VA, a local mental-health center, and one of Russell’s previous employers but had received no records; one facility had indicated that Russell had not been treated there, and another facility refused to release the records. Dr. Pilkinton noted, however, that when Russell was transferred from the Etowah County jail to Taylor Hardin, the transfer summary indicated that Russell had told jail staff members that he believed he was being poisoned by the staff. Furthermore, there was no testimony that Russell was malingering or that he was exaggerating his symptoms; all the evidence was to the contrary — that Russell’s behavior was indicative only of a long-term psychotic disorder.
Moreover, the experts testified that Russell’s explanation of his thoughts and actions at the time of the shooting remained consistent. Russell believed that Anderson was a threat to him because, Russell said, he had received a message from the FBI through the television at the American Legion Post indicating that someone was going to kill him. Russell’s statement to the police immediately after the shooting was identical to the explanation of events Russell consistently gave to the psychiatrists even months after the shooting.
As the United States Court of Appeals for the Eleventh Circuit stated in Wallace v. Kemp:
*796 “This is not a case in which the psychiatrists relied only upon the defendant’s subjective description of his symptoms, see, e.g., Mims [v. United States], 375 F.2d [135,] 145 [(5th Cir.1967) ]; United States v. Makris, 535 F.2d 899, 908 (5th Cir.1976), in which the doctors were unaware of the defendant’s legal problems, see, e.g., Mims, 375 F.2d at 145, or in which there was a lack of any history of mental abnormalities. Id. See generally Strickland [v. Francis], 738 F.2d [1542,] 1553 [(11th Cir.1984) ].
“Although the state countered some of the minor grounds upon which the experts relied, their diagnoses were nonetheless based on overwhelming, accurate additional factors. There was insufficient reason, therefore, for the jury to disregard the psychiatrists’ testimony.”
Wallace v. Kemp, 757 F.2d at 1111.
Finally, relative to the consideration of the first factor regarding the correctness or adequacy of the factual assumptions on which the experts based their opinions, it is highly significant that Russell was declared incompetent to stand trial and that he spent many months in treatment at Taylor Hardin before he was restored to competency.
The record presents no basis on which the jury could have found the experts’ factual assumptions to be inadequate or incorrect. Therefore, this factor does not provide a reason for the jury to have disregarded the experts’ opinion about Russell’s insanity.
2. Possible bias
This factor also provides no reason for the jury to have rejected the experts’ testimony. Dr. Pilkinton and Dr. Hooper were employed by the State of Alabama at Taylor Hardin, and their responsibility was to complete court-ordered forensic evaluations and to provide to the court their objective opinions about Russell’s competency and mental status at the time of the offense. Neither expert was employed by the defense. The State has made no implication of bias in this case, and the record reflects no bias.
3. Inconsistencies in the experts’ testimony or conflict between experts
The State presented no expert testimony. Dr. Pilkinton and Dr. Hooper, Russell’s experts, each testified consistently and repeatedly that Russell was suffering from a longstanding severe mental disorder; that at the time of the shooting, the severe mental disease interfered with his ability to appreciate the nature and character of his actions; that Russell was not malingering; and that Russell’s actions during and after the shooting were consistent with someone suffering from schizophrenia with paranoid delusions. The record discloses no inconsistencies in the experts’ testimony and no conflict between them.
The majority quotes portions of the State’s cross-examination of the psychiatrists in which the experts acknowledged that Russell was capable of goal-directed or intentional behavior and that some of the actions Russell took during and after the shooting could be consistent with someone who was not suffering from a mental disease or defect. However, the majority’s focus on selected portions of the cross-examination of the experts is misleading. The prosecutor asked the experts numerous hypothetical questions about whether certain actions like Russell’s could have been performed by a sane person or whether the actions could have indicated intent or consciousness of guilt. Although the experts acknowledged in their responses to questions that certain actions could have been performed by a sane person, or *797 that it was possible that certain of Russell’s actions might have indicated that he was not mentally ill at the time of the shooting, they also consistently and repeatedly testified that based on their years of experience and their observation and testing of Russell, they believed that Russell suffered from a longstanding mental disorder and that he was not sane when he shot Anderson. In fact, Dr. Hooper testified that, although Russell’s mental health had improved enough so that he was competent to stand trial, he did not believe that Russell was well enough to be released from Taylor Hardin, and he was “not at all sure” that Russell would ever be well enough to be released from inpatient treatment for his mental illness. (R. 434.)
To the extent the majority implies that the State’s cross-examination of the experts regarding hypothetical interpretations of Russell’s behavior resulted in contradictions in their testimony about Russell’s insanity, warranting the jury’s rejection of their expert opinion, such an implication. is in conflict with our precedent. In Herbert v. State, 357 So.2d 683 (Ala.Crim.App.1978), after testifying that Herbert was schizophrenic and insane at the time of the offense, the defense experts acknowledged on cross-examination that a person could demonstrate some of the symptoms they had observed in Herbert and the person would not be insane, that schizophrenics can know right from wrong, and that a sane person could give some of the same answers Herbert gave on a psychological tests. However, after reviewing the record in its entirety, this Court held:
“[Tjhere was apparently nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question. In other words, there were simply no facts before the jury from which opposing inferences might have been rationally drawn. Here, the evidence of insanity is not merely strongly persuasive; it is conclusive.
“There was no evidence that the appellant was sane aside from the mere presumption of sanity. The appellant did not take the witness stand and therefore the jury was not afforded the ‘fruitful opportunity’ to form an estimate of his mental condition and to view, in some measure at least, the operations and perceptions of his mind.”
Herbert v. State, 357 So.2d at 689-90.
As in Herbert, the record here presented no inconsistencies or contradictions in the experts’ testimony, and no basis for the jury to have rejected the expert opinions regarding Russell’s insanity.
4. Lay testimony to the contrary
There was no lay testimony contradicting the expert testimony about Russell’s insanity.
As for the testimony from witnesses about Russell’s actions during the shooting, the majority’s recitation of the facts correctly indicates only that two men at the American Legion Post described Russell as a person who did not socialize with others and who shot Anderson with no apparent motive, then walked calmly away from the scene. That Russell had been a member of the American Legion Post for years but did not socialize or mix well with anyone does not amount to testimony establishing Russell’s sanity. Moreover, that testimony does not contradict or rebut any of the experts’ testimony that Russell was suffering from a mental disease or defect at the time of the shooting and that the mental illness that prevented him from appreciating the nature and character of his actions. See Brock v. United States, 387 F.2d 254, 258 n. 11 (5th Cir.1967) (“[Tjhere is less force to a statement that *798 nothing abnormal was observed than to a clinically based assertion of insanity. An affirmative proposition is little supported by negative observations.”). Nor did testimony that, at the time of his arrest, Russell had just climbed out of the window of the abandoned, boarded-up house he had been living in and was planning to dispose of the gun create a conflict in the testimony. The experts testified that disposing of the gun was entirely consistent with a diagnosis of Russell as a schizophrenic person suffering from paranoid delusions.
Because there was no lay testimony contradicting the expert testimony regarding Russell’s insanity, this factor does not provide an objective reason — or any reason — ■ for the jury’s rejection of the experts’ opinion.
In summary, the reasons offered by the majority to uphold the jury’s rejection of the overwhelming, consistent expert testimony of Russell’s insanity are insubstantial based on an analysis of the entire record and in light of the relevant factors an appellate court must consider when reviewing a jury’s decision to reject expert opinion about mental defects or illness. The jury’s rejection of the uncontradicted expert testimony was not based on any objective reasons. Russell’s conviction could have been sustained only by reliance on the bare statutory presumption that he was sane. That presumption, however, was rebutted by overwhelming and uncon-tradicted evidence. Therefore, the only reasonable conclusion based on the evidence is that the jury arbitrarily disregarded the expert testimony and opinion and that the conviction based on its verdict should be reversed.
Although I have the utmost respect for the jury’s difficult role as factfinder, the jury’s role is subject to an appellate court’s obligation to exercise supervisory authority to ensure the fair administration of justice and, in this case, to ensure that uncontradicted and overwhelming expert testimony is not arbitrarily disregarded. On the basis of the record, there was no objective reason for the jury to disregard the opinions of the two psychiatric experts who presented clear and convincing evidence that at the time of the shooting Russell suffered from a severe mental disease and that he was unable to appreciate the wrongfulness of his actions. One function of the criminal justice system is to hold individuals accountable for their criminal actions, and the system is essential to protect public safety. However, justice is not served by punishing a man suffering from a mental illness for actions that resulted from his life-long, severe mental illness and over which he had neither comprehension nor control.
Russell’s conviction is due to be reversed. Therefore, I must respectfully dissent.
KELLUM, J., concurs.